**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
———————————————————————x

In Re: New York City Policing During Summer 2020
Demonstrations

20-cv-8924 (CM)(GWG)
20-cv-10291 (CM)(GWG)
20-cv-10541 (CM)(GWG)
21-cv-322 (CM)(GWG)
21-cv-533 (CM)(GWG)
21-cv-1904 (CM)(GWG)

———————————————————————x

## MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINTS

McMahon, J.:

In these six consolidated cases, the plaintiffs allege serious police misconduct during protests for racial justice and police reform that occurred throughout the summer of 2020. The lawsuits allege, among other things, that the NYPD violated the First, Fourth and Fourteen Amendments to the U.S. Constitution in responding to the protests, and that officers used excessive and unnecessary force against nonviolent protestors, journalists, and bystanders. Plaintiffs claim that these responses are reflective of a pattern of unconstitutional conduct by the NYPD in responding to peaceful protests.

Before the Court is Defendants' motion to dismiss the operative complaints filed in 20-cv-8924 (dkt. 54, "*Payne* A.C."), 20-cv-10291 (dkt. 38, "*Sierra* A.C.")), 20-cv-10541 (dkt. 48, "*Wood* A.C."), 21-cv-322 (dkt. 52, "*People* A.C.")), 21-cv-533 (dkt. 49, "*Sow* A.C."), and 21-cv-1904 (dkt. 43, "*Yates* Compl.").[1]  (Dkt. 105.)

---

[1] A seventh action, *Rolon v. City of New York*, No. 21-cv-2548, was filed on March 24, 2021. However, it was not consolidated into the consolidated matter until April 29, 2021, at which point the Court stayed the action pending the resolution of the earlier-filed cases.  (Dkt. 7.)

Defendants' motion is GRANTED IN PART and DENIED IN PART.

## BACKGROUND

I.      **Facts**

The following summarizes only those facts pertinent to this motion to dismiss.

A.  *Protests Erupt Throughout New York City*

On May 28, 2020, three days after George Floyd was killed by a police officer in Minneapolis, Minnesota, the first large-scale demonstration protesting police brutality erupted in New York City.  Over 100 protesters gathered in Union Square in Manhattan, some of whom marched in the direction of City Hall.  That day, over 70 protesters were arrested.  (*People* Am. Compl. ¶ 52.)

The protests continued over the subsequent days throughout New York City's boroughs, including on May 29, May 30, and May 31.  (*People* Am. Compl. ¶¶ 53-54.) I will refer to them, and to subsequent protests that are mentioned in various pleadings, as the Black Lives Matter, or BLM, protests.

Most of the complaints do not so much as suggest that persons other than the police engaged in any untoward behavior during these nightly protests. The Attorney General, as befits her office, does admit that there were instances of property damage and injuries to NYPD officers, although the complaint minimizes the seriousness of this misbehavior.  (*People* A.C. ¶ 26.) And the plaintiffs in *Wood* allege, "In the first few days of protests, some isolated and much-publicized instances of theft and violence also occurred."  (*Wood*. A.C. ¶ 32.) However, contemporaneous news reports – of which the Court cannot and will not pretend to be unaware – reported widespread looting, smashed windows, and other property damage connected to the New York City protests.[2]

---

[2] *N.Y.C. Protests Turn Violent*, New York Times (May 31, 2020), https://www.nytimes.com/2020/05/31/nyregion/nyc-protests-george-floyd.html; *After Peaceful*

This conduct by persons who may have been protesters or who may have used the protests as a cover for criminal behavior was no different than what was going on during post-Floyd protests in Minneapolis, Portland, and elsewhere.[3]

On June 1, Mayor Bill de Blasio issued Emergency Executive Order 117 ("EO 117"), which imposed a curfew within New York City between the hours of 11:00 PM on June 1 and 5:00 AM on June 2.  In a subsequent order, Emergency Executive Order 119 ("EO 119"), Mayor De Blasio expanded the nightly curfew to last from 8:00 PM until 5:00 AM, beginning on the evening of June 2 and ending on the morning of June 8.  (*Sow* A.C. ¶¶ 73-74.)  The orders exempted "essential workers," including "police officers, peace officers, firefighters, first responders and emergency technicians, [the homeless], [and] individuals travelling to and from essential work and performing essential work," from the curfew.  (Goykadosh Decl., Ex. F (Dkt. 107-6) at 2.)  Failure to comply would result in orders to disperse; individuals who knowingly violated the orders could be charged with a Class B misdemeanor which, under the City's administrative code, is punishable by a fine of no more than $500 or by imprisonment for no more than three months, or both.  (*Id.*; *see* N.Y.C. Admin. Code § 3-108.)

The protests continued at night despite the curfew orders.  Several demonstrations occurred throughout Manhattan on June 1 and 2, in Manhattan and Brooklyn on June 3, in Manhattan, Queens, Brooklyn, and the Mott Haven neighborhood of the Bronx on June 4, and in Manhattan, Brooklyn, and Staten Island on June 5.  Approximately 889 individuals were arrested at demonstrations between June 1 and June 6.  (*People* A.C. ¶¶ 55-60.)

---

*Protests, Looters Strike at Macy's and Across Midtown, New York Times* (June 2, 2020), https://www.nytimes.com/2020/06/02/nyregion/nyc-looting-protests.html.

[3] *'They Have Lost Control': Why Minneapolis Burned*, New York Times (July 3, 2020), https://www.nytimes.com/2020/07/03/us/minneapolis-government-george-floyd.html.

On June 7, Mayor de Blasio lifted the curfew orders, one day earlier than planned. (*Sow* A.C. ¶ 95.)  Protests continued, mostly peacefully, until June 28, when hundreds of NYPD officers allegedly met protesters in Washington Square Park with violence and pepper spray.  (*People* A.C. ¶¶ 61-62.)

Similar encounters occurred throughout the summer and fall of 2020.  Among others: on July 28, NYPD officers allegedly interrupted a protest in the Kips Bay neighborhood of Manhattan, where they blocked protesters and pushed one protester into an unmarked van that drove away (*id.* ¶ 64); on September 26, hundreds of NYPD officers allegedly disrupted a demonstration in Washington Square Park, where they confiscated the property of the protesters and knocked some into the ground (*id.* ¶ 66); in the days immediately following the 2020 presidential election, NYPD officers surrounded and forcefully arrested protesters in the West Village, Union Square, and the Nolita neighborhood of Manhattan (*id.* ¶¶ 68-69); and on January 18, 2021, Martin Luther King Day, protesters who had marched from the Barclays Center in Brooklyn to City Hall Park were met by a large police presence that encircled protesters and used force to subdue and arrest them (*id.* ¶ 71).

### B.   The NYPD's Alleged Treatment of Protesters

Plaintiffs allege that they were subjected to unconstitutional mistreatment by NYPD officers during the encounters and after their arrests.  On numerous occasions, Police used a tactic called "kettling" to surround, trap, and eventually arrest protesters, without first providing a warning or opportunity for them to leave the area.  (*Payne* A.C. ¶¶ 2, 164-165; *People* A.C. ¶¶ 22, 4; *Wood* A.C. ¶ 44; *Sierra* A.C. ¶¶ 2, 27.)  On nights when Mayor de Blasio's curfew orders were in effect, the police kettled protesters shortly before 8:00 PM so they had no ability to disperse, which resulted in their violating the curfew.  (*Payne* A.C. ¶ 166.)  Plaintiffs allege that police proceeded to beat protesters with batons, shove them with bicycles and pin them to the ground,

injuring many.  (*Payne* A.C. ¶¶ 2, 167; *People* A.C. ¶ 3, *Sierra* A.C. ¶¶ 66-69.)  Plaintiffs further allege that arrested individuals were forcefully handcuffed and held for prolonged periods in overcrowded cells.  (*Payne* A.C. ¶¶ 2, 126, 133, 147, 187, 198, 205, 216; *People* A.C. ¶¶ 244, 249-50, 404; *Sierra* A.C. ¶¶ 75-82, 94-97, 103, 110-114, 120-122.); and that police officers also used force to arrest persons who were observing rather than protesting, including medics in hospital scrubs, journalists with press credentials and legal observers in neon green caps. (*Payne* A.C. ¶¶ 54, 61-62, 97, 130, 161-69.)  All these people were allegedly arrested without probable cause.

Plaintiffs further allege that the treatment of protesters was a result of the City's failure to confront a decades-long pattern of police misconduct during similar protests; the City turned a blind eye to unconstitutional policing during protests; and the NYPD failed adequately to train, supervise and discipline its officers in constitutionally-sound de-escalation tactics for policing protests. As a result, there has long been a widespread pattern and practice of police misconduct during First Amendment protected protests.  (*Payne* A.C. ¶ 218; *People* A.C. ¶ 80.)

*C.  Plaintiffs' Claims*

Plaintiffs, in varying combinations, allege that the NYPD's treatment of protesters violates the First, Fourth, and Fourteenth Amendments to the U.S. Constitution.  More specifically, they assert claims under 42 U.S.C. § 1983, premised on their allegations that the NYPD used excessive force to subdue protesters and observers and executed mass arrests without probable cause, in violation of the Fourth and Fourteenth Amendments.  (The *Sow* plaintiffs also assert this claim under the Fifth Amendment.)  Plaintiffs further assert that, in doing so, Defendants violated Plaintiffs' right engage in constitutionally-protected First Amendment activities.  Plaintiffs also allege that Defendants retaliated against them because of the content of their constitutionally-protected speech – a protest against alleged police misconduct in New York City and elsewhere.

Plaintiffs also assert numerous claims under New York State constitutional and common law, including state law tort claims for assault, battery, false arrest, negligence, negligent supervision and denial of medical treatment.

## II.   Procedural History

Five of the six actions are filed on behalf of individuals who were present at various demonstrations. *See Payne v. De Blasio*, No. 20-cv-8924; *Sierra v. City of New York*, No. 20-cv-10291; *Wood v. De Blasio*, No. 20-cv-10541; *Sow v. City of New York*, No. 21-cv-533; *Yates v. New York City*, No. 21-cv-1904.  *Payne* and *Yates* were brought on behalf of a group of identified individuals and were deliberately not brought as class actions. *Sierra*, *Wood* and *Sow* were filed as class actions, with the named plaintiffs seeking to represent a class of individuals who were wronged by police conduct during the protests. In addition to claims against the City, all five of these actions also allege claims against individual NYPD officers (some named, some not yet identified) and seek compensatory damages under 42 U.S.C. § 1983 on behalf of the named plaintiffs and, presumably, absent class members in the class action cases. The *Payne*, *Sow*, and *Sierra* plaintiffs seek a declaratory judgment that the policies and practices employed by the NYPD are unconstitutional; and the plaintiffs in two of the five cases – *Payne* and *Sow* – also seek to enjoin the continuation of policies the plaintiffs assert are illegal.

The sixth case, *People of the State of New York v. City of New York*, No. 21-cv-322, is filed *in parens patriae* by the Attorney General of the State of New York. The only defendants in *People* are the City, Mayor Blasio, Police Commissioner Dermot Shea and NYPD Chief of Department Terence Monahan. The complaint in *People* alleges three claims under 42 U.S.C. § 1983 and another eight claims under New York law, with the State claiming jurisdiction to pursue the action pursuant to New York State Executive Law § 63(1) and the *parens patriae* doctrine, which "allows states to bring suit on behalf of their citizens in certain circumstances by asserting a 'quasi-

sovereign interest.'" *Connecticut v. Physicians Health Servs. of Connecticut, Inc.*, 287 F.3d 110, 119 (2d Cir. 2002) (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601 (1982)). This action does not allege any claims against any individual NYPD officer, and the amended complaint, which focuses exclusively on the practices and policies of the NYPD, seeks only declaratory and injunctive relief.

Presently before the Court is a motion by four of the defendants – the City of New York, Mayor de Blasio, Commissioner Shea and Chief Monahan – to dismiss the operative pleading in each of the six actions.[4] (Dkt. 105.)  No other named defendant in any lawsuit has filed a pre-answer motion to dismiss the complaint.

All but the *Sow* plaintiffs joined in a consolidated brief opposing Defendants' motion to dismiss; the *Sow* Plaintiffs filed their own papers.

## DISCUSSION

Defendants move to dismiss the complaints pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

## I.      Rule 12(b)(1)

Defendants move to dismiss these six actions pursuant to Federal Rule of Civil Procedure 12(b)(1) on grounds that (1) individual plaintiffs do not have standing to pursue any claim for injunctive or declaratory relief, (2) their claims for injunctive and declaratory relief are moot, and (3) the State of New York does not have standing *in parens patriae*.

---

[4] In every case but *Yates*, the operative pleading is an amended complaint, filed as of right pursuant to Fed. R. Civ. P. 15.

A. *Legal Standard*

"Article III of the Constitution limits federal 'judicial power,' that is, federal-court jurisdiction, to 'Cases' and 'Controversies.'" *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 395 (1980). A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it. See Fed. R. Civ. P. 12(b)(1). Plaintiff bears the burden of proving by a preponderance of the evidence that subject matter jurisdiction exists. *See Malik v. Meissner*, 82 F.3d 560, 562 (2d Cir. 1996). In resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a district court may refer to evidence outside the pleadings. *See Kamen v. American Tel. & Tel. Co.*, 791 F.2d 1006, 1011 (2d Cir. 1986).

B. *The* Payne *And* Sow *Plaintiffs Have Standing To Pursue Injunctive and Declaratory Relief; The* Sierra *Plaintiffs Have Standing to Pursue Declaratory Relief*

The *Payne* and *Sow* plaintiffs seek a ruling declaring that Defendants' actions violated the First and Fourth Amendments and enjoining Defendants (and their offices and employees) from taking any action under the allegedly unconstitutional policies or practices of employing excessive force, false arrests, and retaliatory tactics against protesters. The *Sierra* plaintiffs, however, seek only a declaration that the NYPD's response to the June 4, 2020 Mott Haven protest was unconstitutional. Defendants move to dismiss all these claims for injunctive and declaratory relief, on grounds that none of the plaintiffs has standing to pursue these equitable remedies.

An individual plaintiff may demonstrate standing to seek injunctive and declaratory relief by plausibly alleging the existence of an official policy or custom and a likelihood of future harm from that policy or custom. *An v. City of N.Y.*, No. 16 Civ. 5381 (LGS), 2017 WL 2376576, at *2 (S.D.N.Y. June 1, 2017). For the reasons described *infra*, Plaintiffs have alleged that the NYPD had a policy or custom of using excessive force and mass arrests to effectuate crowd control at

First Amendment-protected activities.  Thus, whether Plaintiffs have standing to seek injunctive and declaratory relief turns on whether their allegations show a likelihood of future harm.

While reserving judgment on whether there was anything unconstitutional about the way police handled the protests during the summer of 2020, at this stage in the proceedings it appears that the *Payne* and *Sow* plaintiffs face a realistic prospect of future harm.  In the amended complaints, the *Payne* and *Sow* plaintiffs allege that they will continue to participate in protests throughout the City.  (*See Payne* A.C. ¶¶ 124, 137, 142, 193, 201; *Sow* A.C. ¶ 516.)  At the motion to dismiss stage, this Court is required to accept those well-pleaded allegations as true.  Furthermore, as described *infra*, Plaintiffs have alleged a systematic, ongoing, and city-wide practice of unlawful policing at large-scale protests dating back to at least 2003.  Many of the individual plaintiffs have attended multiple protests where unconstitutional policing is alleged to have occurred, and at least two were arrested twice.  (*Sow* A.C. ¶¶ 220-27, 310-30; *Payne* A.C. ¶¶ 124, 138-39, 181, 201.)  Those allegations of repeated unlawful conduct, combined with the sheer volume of violations alleged by Plaintiffs, are sufficient for the Court to conclude that the possibility of an encounter with the NYPD, and with NYPD policies, is far from speculative.  *See Stauber v. City of New York*, 2004 WL 1593870, at *18-19 (S.D.N.Y. 2004); *Roe v. City of New York*, 151 F. Supp. 2d 495, 502-03 (S.D.N.Y. 2001) (collecting cases).

The *Sierra* plaintiff also have standing to pursue their claim for declaratory relief.  They do not seek an injunction or declaratory relief relating to future conduct – they seek only a declaration that past conduct was unlawful.  They allege that they were victims of that past conduct.  Accordingly, they have standing to assert that claim.

## C.  Injunctive and Declaratory Relief Claims Are Not Moot

"[A]t all times, the dispute before the court must be real and live, not feigned, academic, or conjectural." *Russman v. Bd. of Educ.*, 260 F.3d 114, 118 (2d Cir. 2001). "When the issues in

dispute between the parties 'are no longer live,' a case becomes moot." *Lillbask ex rel. Mauclaire v. State of Conn. Dep't of Educ.*, 397 F.3d 77, 84 (2d Cir. 2005) (quoting P*owell v. McCormack*, 395 U.S. 486, 496 (1969)). Therefore, even if standing exists when the plaintiff files the complaint, this Court lacks subject matter jurisdiction if it concludes that the case is moot. *Fox v. Bd. of Trs. of State Univ. of N.Y.*, 42 F.3d 135, 140 (2d Cir. 1994).

Here, Defendants contend that Plaintiffs' claims for forward-looking injunctive and declaratory relief are moot because the City has already taken steps to address police misconduct and, as a result, there is no expectation that the events of last summer will recur.  The Court disagrees.

"It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (quotation omitted).  Cessation of allegedly illegal activities can moot a claim only "if the defendant can demonstrate that (1) there is no reasonable expectation that the alleged violation with recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation."  *Seidmann v. Bowen*, 499 F.3d 119, 128 (2d Cir. 2007) (quoting *Granite State Outdoor Advert., Inc. v. Town of Orange, Conn.*, 303 F.3d 450, 451 (2d Cir. 2002)).  "The heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness."  *Laidlaw*, 528 U.S. at 189 (cleaned up).

Defendants have not met that burden.  A majority of the so-called voluntary reforms – which include a new disorder control training for officers, several draft policies that are not yet in effect, and other initiatives marked as "in progress" (*see* Goykadosh Decl. Exs. A, B, C, I, J) – are not finalized.  The fact that reforms remain under consideration does not moot the issues presented

in these cases for the straightforward reason that they are not yet in effect, and Defendants' "prospective intentions do not eradicate[] the effects" of the alleged unconstitutional policing. *Saba v. Cuomo*, No. 20-cv-5958, 2021 WL 1600496, at *5 (S.D.N.Y. Apr. 23, 2021). Neither does the new disorder control training, which the NYPD adopted sometime between July and October 2020. (*People* A.C. ¶¶ 106-07.) Plaintiffs have alleged instances of police misconduct since then, including in the days after the 2020 presidential election and on January 18, 2021, notwithstanding the implementation of that training. (*Id.* ¶¶ 68-69, 71.) Defendants cannot sincerely assert that the challenged conduct cannot reasonably be expected to recur when it has, in fact, recurred.

To the extent Defendants argue that certain measures taken by the City were not voluntary, but instead were taken in response to Governor Cuomo's June 2020 orders requiring the City to conduct a review of the NYPD's response to the protests: Those measures amount to the development of three draft plans for reform, the latest of which the City Council recently adopted. (Goykadosh Decl. Ex. G, H, I.) But even the plan adopted by the City Council is still just a plan; its objectives, which include "the decriminalization of poverty," "recognition and continual examination of . . . racialized policing," and "a diverse, resilient, and supportive NYPD" have not yet come to fruition. It remains to be seen whether any of the concrete practices that will eventually be adopted pursuant to the plan will have any impact on the behavior that Plaintiffs allege is unconstitutional.

Accordingly, the Court declines to dismiss the claims for injunctive and declaratory relief as moot.

### D. The State of New York Has Parens Patriae Standing

Defendants argue next that the Attorney General's amended complaint must be dismissed because the State does not have standing *in parens patriae* to sue on behalf of its citizens.

There are three requirements for a state to have standing to sue on behalf of its citizens, otherwise known as *parens patriae* standing: (a) injury to a sufficient number of state citizens; (b) a quasi-sovereign interest and (c) a barrier to individual plaintiffs obtaining complete relief. *New York v. Griepp*, 991 F.3d 81, 131 (2d Cir. 2021). Defendants concede that the first requirement is satisfied, but argue that the State cannot satisfy the other two prongs.

"Courts routinely acknowledge that a state has a quasi-sovereign interest in the health and well-being – both physical and economic – of its residents." *Griepp*, 991 F.3d at 132. Of particular relevance here is the State's interest in "the prevention of lawless exercises of the powers its laws confer upon police officers." *Pennsylvania v. Porter*, 659 F.2d 306, 315 (3d Cir. 1981) (*en banc*); *see also New York v. Town of Wallkill*, No. 01-Civ-0364 (CM), 2001 U.S. Dist. LEXIS 13364, at *9 (S.D.N.Y. Mar. 16, 2001). That is precisely the interest that the State seeks to vindicate, as is evident from its claims under Section 1983 for excessive force, unlawful seizure and First Amendment violations, as well as parallel claims under the New York State Constitution.

Defendants recognize this interest, but contend that the State's interest is "misplaced" because it is already being furthered through means other than litigation. For example, Defendants cite to the DOI's and the New York City Corporation Counsel's review of the NYPD's response to the protests, and assert that Mayor de Blasio and Commissioner Shea have accepted and are in the process of implementing the recommendations resulting from those reviews. Defendants also point to steps that the New York State legislature has taken, including the establishment of a law enforcement misconduct investigative office. The Court, however, is not persuaded that a backward-looking review process is sufficient to negate the State's interest in protecting its citizens against future constitutional violations.

The State also satisfies the third prong of *parens patriae* standing, inadequacy of individual suits.  The Second Circuit has confirmed that this requirement is satisfied "when it is difficult and costly to litigate claims, and when the interests of individuals are not necessarily coextensive with those of the public." *Griepp*, 991 F.3d at 192 (internal quotations omitted).  The numerous and complex issues presented in this lawsuit, coupled with the sheer breadth of relief that the State seeks, make it apparent that the State's claims require resources and expertise that private parties often lack.  Although the *Payne* and *Sow* plaintiffs also seek injunctive relief, the relief sought by the State is far broader – it covers not only protesters, but also journalists, legal observers, medics, and others.  Moreover, as the case law recognizes, private litigants "have greater incentive to compromise requests for injunctive relief in exchange for increased money damages." *People v. Peter & John's Pump House*, 914 F. Supp 809, 813 (N.D.N.Y. 1996).  The State, which seeks only declaratory and injunctive relief, faces no such conflict.

New York State has thus satisfied all three requirements for asserting *parens patriae* standing.

## II.    Rule 12(b)(6)

### A.  *Legal Standard*

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 556).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief

requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal quotations, citations, and alterations omitted). Thus, unless a plaintiff's well-pleaded allegations have "nudged [its] claims across the line from conceivable to plausible, [the plaintiff's] complaint must be dismissed." *Id.* at 570; *Iqbal*, 129 S. Ct. at 1950–51. The Court must accept all factual allegations as true and draw all reasonable inferences in Plaintiff's favor. *ATSI Commc'ns., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

   B. *Application*

   Defendants do not move to dismiss the complaints on grounds that no constitutional violations occurred during the BLM protests.  They argue that the complaints should be dismissed because (1) the demonstrations took place while the City was navigating a pandemic; (2) police officers as well as civilians were beaten and injured in the protests; and (3) NYPD is in the process of implementing changes to its policies concerning the policing of protests.

   Listing these "reasons" for dismissing the complaints makes it clear that Defendants are not seeking to have these actions dismissed in their entirety for failure to file "well pleaded" complaints.

   Instead, Defendants move to dismiss on the much more limited basis that Plaintiffs have failed to state their federal constitutional claims against the City, Mayor de Blasio, Commissioner Shea, and Chief Monahan on the ground that there is no theory of liability under which the four moving defendants can be held responsible for the actions of individual NYPD officers.

   1. Municipal Liability

   Defendants first argue that the City cannot be held liable for the actions of individual NYPD officers because Plaintiffs have not satisfied the requirements for pleading municipal liability under *Monell v. Department of Social Services.*, 436 U.S. 658 (1978).

14

To hold a city liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: "(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right."  *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007) (cleaned up).  "Constitutional deprivations actionable under § 1983 need not be contained in an explicitly adopted rule or regulation."  *Sorlucco v. New York City Police Dep't*, 971 F.2d 864, 870 (2d Cir. 1992).  But "a municipality may not be held liable under § 1983 simply for the isolated unconstitutional acts of its employees."  *Id.*  The "official policy" requirement may be met by alleging, among other things, (1) a practice so "persistent and widespread," or "permanent and well settled as to constitute a 'custom or usage' with the force of law" and to "imply the constructive knowledge of policymaking officials," *id.* at 870-71 (citing *City of St. Louis v. Prapotnik*, 485 U.S. 112, 113 (1988) (plurality)); (2) "deliberate indifference to the rights of those with whom [the employees] come into contact," *City of Canton v. Harris*, 489 U.S. 378, 388 (1989); or (3) "actions taken by government officials responsible for establishing municipal policies that caused the particular deprivation in question," *Kucharczyk v. Westchester Cty.*, 95 F. Supp. 3d 529, 538 (S.D.N.Y. 2015).

Defendants do not contest that plaintiffs have alleged facts tending to support the second and third elements of municipal liability (causation and the denial of a constitutional right).  They move to dismiss Plaintiffs' *Monell* claims on the basis that Plaintiffs have not alleged an official policy or custom, for the following three reasons: (1) Defendants have not admitted to any unconstitutional policies; (2) Plaintiffs allege no formal policy; and (3) Plaintiffs have not pleaded the existence of a *de facto* policy, supported by allegations of an unofficial policy or custom or policymakers' deliberate indifference.

At the pre-answer juncture, Defendants' arguments are not convincing. Whether Defendants have admitted to the unconstitutionality of their practices is irrelevant. And with the exception of the *Sow* plaintiffs' claim relating to the curfew orders, Plaintiffs do not purport to allege that the NYPD has a formal, written policy directing officers to violate the constitutional rights of protesters. But Plaintiffs do allege the existence of an official albeit unwritten policy or custom, which can be discerned from (1) a widespread pattern of the complained-of practices that extends back many years; and (2) a persistent failure to train and supervise NYPD officers in the proper policing of protests.

   i.   *All Plaintiffs Have Stated Claims For Municipal Liability Predicated On The Use of Force And Mass Arrests*

      a.   Custom or Policy

The Attorney General and the *Payne*, *Wood*, *Sierra*, and *Sow* plaintiffs plead specific facts from which, if proven, would allow a trier of fact to conclude that NYPD officers engaged in a variety of practices that constituted false arrest, excessive force or retaliation for the exercise of First Amendment rights.

To make out a custom, policy or practice claim with respect to the NYPD's use of excessive force and mass arrests of protesters, these five groups of plaintiffs point to NGO reports that document accounts of police misconduct at anti-war protests in the early 2000s and during the 2011 Occupy Wall Street demonstrations, targeted at protesters, bystanders, lawyers, legal observers, and journalists alike (*People* A.C. ¶¶ 25-26, 31, *Sierra* A.C. ¶ 9, 127; *Sow* A.C. ¶¶ 423, 426); numerous lawsuits alleging incidences of police brutality against protesters, bystanders, legal observers, and journalists (most of which were settled and some of which are ongoing) (*People* A.C. ¶ 32, *Sow* A.C. ¶¶ 428-29, *Sierra* A.C. ¶¶ 143-149); thousands of Civilian Complaint Review Board ("CCRB") complaints regarding the NYPD's response to the protests that took place

between May 28 and June 20, 2020 alone, as well as hundreds more dating back to 2003 (*Payne* A.C. ¶ 92, *People* A.C. ¶¶ 25, 34; *Sow* A.C. ¶ 120); the NYPD's decision to deploy officers who were the subjects of such lawsuits and CCRB complaints to the BLM protests as part of the NYPD's Strategic Response Group ("SRG") (*Sow* A.C. ¶¶ 451-55); NYAG, Human Rights Watch, Corporation Counsel and Department of Investigation ("DOI") investigations and reports documenting the police response to the BLM protests and protests past (*Payne* A.C. ¶¶ 95-106, *People* A.C. ¶¶ 73-97, 106-07, 276-97, *Sierra* A.C. ¶ 147; *Wood* A.C. ¶ 176; *Sow* A.C. ¶¶ 7, 120)[5]; and, of course, the individual incidents alleged in the complaints.  Plaintiffs contend that these factual allegations are sufficient to plead that the NYPD had long had a widespread practice of employing excessive force to police large demonstrations throughout New York City – a practice so persistent and long-standing that Mayor de Blasio, Commissioner Shea and Chief Monahan can be imputed with constructive knowledge of its existence.  The Court agrees.

Defendants also contend that Plaintiffs have merely identified a series of isolated acts that are insufficient to demonstrate a municipal custom that would justify the imposition of municipal liability.  They argue that the practices that Plaintiffs identify, including the alleged use of bikes, batons, tasers, and pepper spray to assault and subdue protesters, shoving and punching, are too numerous to give rise to a unified pattern of police misconduct.

---

[5] "In reviewing a motion to dismiss, a court may consider, *inter alia*, (1) documents that are incorporated by reference into the complaint, and (2) documents that, even if not incorporated by reference, the defendant has notice of and that are 'integral' to the complaint" without converting the motion to dismiss to a motion for summary judgment. *BankUnited, N.A. v. Merrit Envtl. Consulting Corp.*, 360 F. Supp. 3d 172, 183 (S.D.N.Y. 2018) (citing *Weiss v. Inc. Vill. Of Sag Harbor*, 762 F. Supp. 2d 560, 567 (E.D.N.Y. 2011); *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47–48 (2d Cir. 1992).  The pleadings refer to and quote from these documents, making it proper to consider them in determining the motion.

But Defendants do not cite a single case requiring this Court to narrow its view of the *Monell* claim to a single, individual tactic employed by police.  Plaintiffs allege that there exists a widespread practice of trying to control crowds at protests – notably those with political overtones, which plainly implicated Plaintiffs' First Amendment rights – by employing excessive force (whether by baton or bicycle is irrelevant) and by making mass arrests without probable cause. The fact that the complaints allege that excessive force was perpetrated in multiple ways and at multiple protests does not alter the implications of the facts pleaded, which are that a variety of tactics were used to impede the Plaintiffs from exercising their right to protest or to punish them for doing so.

Even if Plaintiffs were required to plead a discrete custom or policy for each individual tactic, their allegations would still be sufficient to state a claim for municipal liability.

For example, the *Payne* amended complaint alleges that the NYPD kettled protesters to prevent them from dispersing at a significant number of demonstrations that occurred during the summer and fall of 2020 – including on six separate occasions between May 28 and June 4, 2020 alone – all of which led to mass arrests without probable cause.  (A.C. ¶¶ 44, 47, 50, 55, 59, 74, 76, 77, 78.)  The same pleading refers to additional instances of kettling that took place as long ago as 2003 and 2004 during large-scale protests (*id.* ¶ 66) and cites to reports by the DOI and Human Rights Watch, both of which highlighted the NYPD's unwarranted use of this tactic (*id.* ¶¶ 99, 105).  Drawing all inferences in favor of Plaintiffs, those allegations create a plausible inference of a custom or practice of the unwarranted use of kettling in order to effect the mass arrests of peaceful protesters who were literally prevented from complying with the Mayor's curfew order.

The Attorney General's *parens patriae* complaint and the *Sow* plaintiffs' complaint contain allegations concerning "kettling" that are nearly identical to those in Payne. All three complaints also plead specific instances of other practices – perfectly permissible police practices in the right context, such as the use of batons, bikes, and pepper spray – in an impermissible manner and/or for impermissible purposes during the BLM protests.[6] Again drawing all inferences in favor of the pleader, those allegations are sufficient as well.

In short, Plaintiffs identify a number of police practices that were allegedly wrongfully used or abused during the BLM protests and pleads facts from which it could be inferred that this was not some "one off" instance of misuse of these practices, but had been part and parcel of the NYPD's "arsenal" for dealing with political protests for that past two decades. That sufficiently pleads a custom or policy of using excessive force and making false arrests at large protests throughout New York City.

### b.  Deliberate Indifference

The Attorney General and the *Payne*, *Wood*, *Sierra*, and *Sow* plaintiffs have also adequately plead municipal liability under the theory that the City was deliberately indifferent to the Plaintiffs' constitutional rights during the BLM protests.

**Failure To Train.**  To allege such deliberate indifference based on a supervisor's alleged failure to train, a plaintiff must show an obvious need for more or better supervision to protect against the constitutional violations, which may be inferred from, among other things, a demonstrated failure to train or supervise subordinates.  *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir.1995). At the pleading stage, this means, at least in this Circuit, that a complaint alleging deliberate indifference must plead some facts that, if proven, would tend to show that (1)

---

[6] The *Wood* and *Sierra* plaintiffs' amended complaints incorporate these allegations by reference.  (*Wood* A.C. at 5 n.1.; *Sierra* A.C. ¶¶ 146, 148, 149.)

a policymaker knows "to a moral certainty" that employees will confront a given situation; (2) "the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation and (3) "the wrong choice will frequently cause the deprivation of citizens' constitutional rights." *Jenkins v. City of New York*, 478 F.3d 76, 94 (2d Cir. 2007) (quoting *Walker v. City of New York*, 974 F.3d 293, 297 (2d Cir. 1992)).

The facts pleaded and discussed above easily admit of the  following *Jenkins/Walker* inferences: (1) the police had encountered numerous similar protests in years past, (2) as a result, the policymaker defendants had to know to a moral certainty that the BLM protests would result in certain types of behavior by the protesters that were likely to lead to certain types of responses by the police;  (3) there would be difficult policing decisions to make in trying to keep the protests under control without violating the protesters' First Amendment rights; (4) training police officers to deal with crowd control in these specific situations could make it easier for them to make the right decisions; and (5) making the wrong decision (i.e., by employing too much force) could result in depriving protesters of their constitutional rights. Indeed, the essence of the deliberate indifference allegations in the complaint is that these situations arise repeatedly in New York City, yet the NYPD – despite years of litigation and complaints involving police behavior at mass political protests – still  has not come up with a way to train its officers to control crowds without violating constitutional rights. Again, viewing these allegations in the light most favorable to Plaintiffs, the Court concludes that the five complaints sufficiently allege municipal liability under a "deliberate indifference" theory. *See Bertuglia v. City of New York*, 839 F. Supp. 2d 703, 738–39 (S.D.N.Y. 2012).

Defendants argue that the COVID-19 pandemic fundamentally changed the nature of the protests that took place in the summer and fall of 2020, and so the City could not have known that NYPD officers would (1) confront protesters with violence, (2) conduct mass arrests, and (3) refuse to wear masks in violation of state law.  But the plaintiffs do not allege that the NYPD handled the BLM protests differently because of the pandemic. Quite the contrary: masks aside, the behaviors alleged to be unconstitutional in these complaints are exactly the same behaviors that were alleged against the same police force in connection with the demonstrations in 2003, during the 2004 Republican National Convention, and during the 2011 Occupy Wall Street protests, when there was no pandemic. The pandemic did not lessen the plaintiffs' right to engage in First Amendment protected behavior, *see Roman Catholic Diocese v. Cuomo*, 141 S.Ct. 63 (2020); neither did it divest them of their right to be free from excessive force or from arrest without probable cause.  In their pleadings, Plaintiffs are not "taking the pandemic out of the equation," as Defendants contend.  Rather, they allege the existence of a decades-old problem, one that existed prior to the pandemic and that was allegedly dealt with in the same way before and during the pandemic.[7] Defendants' invocation of the pandemic is a total red herring.

To the extent that Defendants argue that there were differences between the BLM protests of 2020 and the protests that took place in 2003, 2004 and 2011 – and that these differences rendered conduct that might have been unlawful during the earlier protests lawful in this instance – that is not an appropriate argument for a motion to dismiss, which is addressed to the sufficiency

---

[7] In 2015, the OIG issued a report acknowledging the NYPD's need for improved training on the use of force and de-escalation tactics, though the report was not limited to the use of those tactics to control protests.  The report found that the NYPD's "use-of-force police was vague and imprecise;" its "training programs did not adequately focus on de-escalation"; and it "frequently failed to impose discipline even when provided with evidence of excessive force."  (*People* A.C. ¶ 33.)

of the allegations of the complaint, not the sufficiency of the evidence. Perhaps it is an argument that can be made on a motion for summary judgment or at trial. But it goes well beyond the four corners of the pleadings and would require consideration of evidence in connection with a motion where evidence is not relevant. The only issue is whether the inference the plaintiffs seek to have the trier of fact draw from their allegations is plausible. It is. Whether Plaintiffs' suggested inference is the only inference that can be drawn, or the best inference that can be drawn, is a question for another day.

Finally, Defendants assert that Plaintiffs cannot satisfy the third prong of the *Jenkins/Walker* test – which asks whether the wrong choice will frequently cause the deprivation of constitutional rights – because there has only been one liability verdict arising out of an alleged constitutional violation stemming from a protest (in that case, against Monahan arising out of the 2004 RNC protests).  But that is absurd. Plaintiffs have alleged that hundreds of other lawsuits were brought and settled out of court prior to trial, while others are ongoing.  Defendants certainly knew to a moral certainty that the employment of the kind of crowd control tactics that were used during the 2003-04 and 2011 protests would lead to allegations of constitutional violations – allegations that would result in numerous lawsuits, which would likely not be dismissed on motion. The fact that the lawsuits were settled goes only to the weight to be afforded to Plaintiffs' evidence. *See Medina v. City of New York*, No. 19-cv-9412 (AJN), 2020 WL 7028688, at *8 (S.D.N.Y. Nov. 30, 2020).

Defendants will have an opportunity at an appropriate time to argue that Plaintiffs have failed to prove any history of employee mismanagement. But at this stage, the issue is only whether the well pleaded facts alleged by the Plaintiffs – which are presumed true by the Court – "allows

the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Iqbal*, 129 S. Ct. at 1949.  The answer is yes.

**Ratification.**  The Attorney General and the *Payne*, *Sow*, and *Wood* plaintiffs also allege that Defendants acted with deliberate indifference to their constitutional rights by implicitly ratifying their subordinates' unconstitutional conduct.  *Jones v. Town of E. Haven*, 691 F.3d 72, 81 (2d Cir. 2012).  Because "the disposition of the policymaker may be inferred from his conduct after the events giving rise to the constitutional violation." *Collins v. City of New York*, 923 F. Supp. 2d 462, 477 (E.D.N.Y. 2013) (brackets omitted) (quoting *Grandstaff v. City of Borger*, 767 F.2d 161, 170 (5th Cir. 1985)), "deliberate indifference may be inferred if the complaints [of wrongdoing] are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents," *Vann*, 72 F.3d at 1049, or from allegations that policymakers "repeatedly condoned and even rewarded" unlawful police conduct, *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983).  Like any other theory of deliberate indifference, "The operative inquiry is whether the facts suggest that the policymaker's inaction was a result of 'conscious choice' rather than mere negligence." *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 128 (2d Cir. 2004) (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989)).

Plaintiffs allege that the policymaker defendants ratified the unlawful actions taken by NYPD officers when they made the following statements praising and defending their actions: After an NYPD truck drove into a crowd of protesters, Mayor de Blasio stated on May 30, 2020, "I do believe the NYPD has acted appropriately."  (*Payne* A.C. ¶ 48.)  On May 31, 2020, Commissioner Shea tweeted, "In no small way, I want you to know that I'm extremely proud of the way you've comported yourselves in the face of such persistent danger."  (*Payne* A.C. ¶ 49.)  And after the Mott Haven protest on June 4, 2020, Commissioner Shea publicly stated that the

NYPD "had a plan which was executed nearly flawlessly" (*People* A.C. ¶ 387, *Wood* A.C. ¶ 7, *Sow* A.C. ¶ 187, *Payne* A.C. ¶ 69.)

In addition to these statements, the plaintiffs allege that Defendants have shown deliberate indifference by failing to discipline officers in any meaningful way. They allege numerous instances of the NYPD's ignoring CCRB disciplinary recommendations following complaints of police misconduct. (*People* A.C. ¶¶ 34-36.) Notably, they allege that the NYPD failed to discipline then-Deputy Chief Monahan after he directed the use of force and mass arrests without probable cause to subdue protesters at the 2004 RNC protest; instead, he was eventually promoted to Chief of Department, and in that capacity directed the use of the same strategies against the Mott Haven protesters on June 4, 2020. (*People* A.C. ¶ 29; *Wood* A.C. ¶¶ 114-15.) With respect to the BLM protests, they allege that at most, three officers have been disciplined for their actions – and none for their actions during the Mott Haven protest – a shockingly low number given the volume of allegations of police misconduct throughout the BLM protests. (*People* A.C. ¶¶ 37, 29[8]; *Wood* A.C. ¶186; *Sow* A.C. ¶ 507.)

In support of their deliberate indifference claim, the *Sow* plaintiffs also allege that the NYPD repeatedly deployed a specialized unit called the Strategic Response Group ("SRG") to police the BLM protests, notwithstanding the fact that many members of SRG, including many who were at the BLM protests, have faced CCRB complaints and lawsuits stemming from their prior use of the same policing tactics complained of in these lawsuits. (*Sow* A.C. ¶¶ 440-45.) They allege further that, in the past, the NYPD created "after-action reports" that documented and analyzed plans for and responses to protests in the early 2000s; that some of the reports praised

---

[8] The *Payne* plaintiffs incorporate paragraphs 27 – 32 of the Attorney General's amended complaint into their own. (*Payne* A.C. ¶ 219.)

officers for using "militarized tactics"; and that after several of those reports were made public during the course of the litigation over the 2004 RNC protests, they NYPD stopped creating these reports altogether.  (*Id.* ¶¶ 451-55.)

Taken together, these allegations give rise to an inference that Defendants ratified the actions taken by the NYPD by publicly praising, failing to discipline, and, at times, even rewarding officers for their conduct.

In their motion to dismiss, Defendants assert that Plaintiffs' own allegations preclude an inference that the municipality ratified officers' unlawful conduct.  They point to the Corporation Counsel and DOI investigations, both of which were undertaken at the direction of Mayor de Blasio, as well as to a handful of statements made by the Mayor in which he, according to Defendants, condemned the NYPD's behavior. [9]

Defendants rely on one statement in particular.  During a June 4 press conference, a reporter asked Mayor de Blasio about a widely circulated video showing NYPD officers hitting protesters with batons at a protest on June 3.  When asked if he condoned the officers' behavior, the Mayor denied having seen the video (though it was allegedly shown to him the previous night), and responded: "It is the nature of New York City and the restraint shown by the NYPD that we're trying to give people extra space, if they do it the right way – if they respect the instructions of the NYPD and do no violence, no harm – don't commit any violence."  (*Payne* A.C. ¶ 56; *Wood* A.C. ¶¶ 182-83.)  Defendants insist that this statement shows that the Mayor disapproved of the officers' use of force.

---

[9] Defendants mention several other reforms that the City is undertaking, and argue that it is only a matter of time before more officers are disciplined for their role in policing the BLM protests. None of those remedial measures is contained within the four corners of the complaints; they cannot properly be considered at this stage.

But it is also plausible to infer from that statement that Mayor de Blasio chose to ignore widely circulated evidence of the alleged use of excessive force by the police, and instead lauded officers for their "restraint." Plaintiffs are, for now, entitled to the latter inference.

As to the investigations and the remaining statements: The Mayor directed DOI to conduct a review of the NYPD's response to the BLM protests on May 31, 2020 (Goykadosh Decl. Ex. D at 2), and directed the Corporation Counsel's office to do the same on June 20, 2020 (Goykadosh Decl. Ex. E at 1). Those investigations led to the DOI and Corporation Counsel reports relied upon in the pleadings. The Attorney General's complaint also alleges that, on June 5, 2020, Mayor de Blasio told a reporter that he "did not like everything [he] saw in the videos" of the NYPD's response to the Mott Haven protest (*People* A.C. ¶ 101), and on December 18, 2020, he acknowledged a need for better training (*id.* ¶ 110). These factual allegations may very well suggest that the Mayor eventually took steps to address the behavior on which these lawsuits are predicated. However, drawing all inferences in favor of Plaintiffs at the pre-answer stage, a trier of fact could plausibly infer, from the allegations regarding the City's long history of inaction, that the City maintained a policy of deliberate indifference to Plaintiffs' constitutional rights leading up to and during the first few days of the BLM protests.

The Attorney General and the *Payne*, *Wood*, *Sierra*, and *Sow* plaintiffs have therefore stated a claim for municipal liability.[10]

---

[10] In addition to the claims described above, the *Sierra* plaintiffs also allege that the City has a policy of racially biased policing, and that such policy caused a disproportionate number of minority arrests during the BLM protests, in violation of the Fourteenth Amendment. Defendants do not address this claim in their motion to dismiss; neither do Plaintiffs in their opposition. It remains in the case.

Finally the City moves to dismiss the *Yates* complaint to the extent its municipal liability claim is predicated on a policy of using excessive force and mass arrests to effect crowd control at protests.

Yates alleges that he participated in a protest on May 31, 2020, during which NYPD officers surrounded and charged at protesters, hit him with their batons, and detained him without probable cause. (*Yates* Compl. ¶¶ 13-31.) He alleges that similar unconstitutional tactics were used against others at protests on May 29 and June 2, and at two protests on June 4. (*Id.* ¶ 23.) Other than that, his allegations of a widespread practice of police misconduct are limited to the following conclusory statement: "In the protest in this matter, as well as the protests listed above, and in decades worth of prior protests, the NYPD has allowed its officers to indiscriminately use force on peaceful protesters, including allowing random baton strikes on peaceful protesters." (*Id.* ¶ 24.) The detailed factual allegations that characterize the other plaintiff's pleadings are conspicuously missing.

If *Yates* were the only case pending, I might well conclude that Plaintiff's allegations of police misconduct at five protests during a single week in 2020, coupled with the purely conclusory allegation that similar conduct occurred at an unspecified number of protests in past decades, without more, was insufficient to plead a claim that the NYPD has a widespread practice of engaging in practices that constituted excessive force, false arrest, or retaliation when confronting protesters. *See Felix v. City of New York*, 344 F. Supp. 3d 644, 659 (S.D.N.Y. 2018); *Kucharczyk v. Westchester Cty.*, 95 F. Supp. 3d 529, 543 (S.D.N.Y. 2015). However, *Yates* is not the only case; I would have to dismiss without prejudice, because the municipal liability claims it asserts are not time barred; and all that will happen is that Yates' counsel will refile, parroting the allegations that have already been found to be sufficient in the other cases. Rather than subject us

all to the possibility of yet another round of preliminary motions in connection with what is, in essence, a copycat case, I conclude, in the context of this consolidated set of cases, that the *Yates* pleading gets across the line. I reach the same conclusion with respect to the deliberate indifference theory of municipal liability, because there is no principled basis to dismiss the Yates complaint when it is perfectly clear that all plaintiffs have sufficiently alleged that Defendants knew "to a moral certainty" that NYPD officers would confront certain types of behavior from protesters that would require them to make difficult policing decisions, that the wrong decision could result in the deprivation of protesters' constitutional rights, or that training officers in ways to manage the crowds without violating the First Amendment could make it easier for those officers to make the right decision. *See Jenkins v. City of New York*, 478 F.3d 76, 94 (2d Cir. 2007) (quoting *Walker v. City of New York*, 974 F.3d 293, 297 (2d Cir. 1992)). The City is not wrong that Yates could (and should) have done a better job of crafting a pleading, but – again in the context of all the other cases being litigated – it is clear enough what is alleged.

> ii.    *Allegations Unique to the Sow Plaintiffs*

The *Sow* plaintiffs assert several additional grounds for holding the City liable under *Monell*.

They allege that the City had an official policy of enforcing curfew orders selectively and without first ensuring that protesters were given an order to disperse. The curfew order itself provides, "Failure to comply with this Order shall result in orders to disperse, and any person who knowingly violates the provisions in this Order shall be guilty of a Class B misdemeanor." The *Sow* plaintiffs suggest that individual officers did not give dispersal orders and ask the trier of fact to infer that this was official city policy.

Nothing in the Constitution requires that police give a dispersal order once a curfew is in effect before arresting a violator for a curfew violation. However, failing to give such an order,

especially where, as here, one is explicitly required, may be relevant evidence in connection with a claim of false arrest. *See Dinler v. City of New York*, 2012 WL 4513352, at *6 (S.D.N.Y. Sept. 30, 2012).

But that does not mean the City can be held liable for the failure to give dispersal orders on the ground that not giving them prior to arrest was "city policy." There is not a single factual allegation in the complaint tending to show that it was official City policy that no dispersal order be given. The text of the order is the best evidence of the City's official policy, and the text of the curfew order says that dispersal orders should be given. There is no allegation that the Mayor, or Chief Monahan, or Commissioner Shea ever told a single police officer to ignore what the curfew order said, so no municipal liability can be inferred from their behavior. What the *Sow* plaintiffs allege is that individual officers ignored official City policy when enforcing the curfew order. That cannot be a basis for *Monell* liability.

The *Sow* plaintiffs alternatively allege that the City should be held liable under *Monell* because they failed to train NYPD officers to enforce the curfew order in accordance with its terms. That is encompassed by the failure to train argument already discussed (*see supra*, pp. 19-22). The evidence will point one way or another. But failure to train evincing deliberate indifference is the only conceivable basis for *Monell* liability predicated on the failure to give a dispersal order. Official City policy it was not.

Finally, the *Sow* plaintiffs allege that the City was deliberately indifferent to their constitutional rights because it failed to train officers in proper mask wearing protocols, resulting in many officers not wearing, or not properly wearing, masks during the BLM demonstrations. The City has yet to address the possibility that protesters did not have a *constitutional* right to (i) have police officers wear their masks properly, or (ii) have the City train them to do so (a purely

conclusory allegation on the part of the *Sow* plaintiffs). So the Court will not visit this issue at present; I simply flag it for future reference.

2.  Claims Against the Individual Defendants in Their Official Capacities

The Attorney General and the *Payne* and *Sow* plaintiffs sue Mayor de Blasio, Commissioner Shea and Chief Monahan in both their official and individual capacities. Defendants move to dismiss the claims brought against these three individual defendants in their official capacities on grounds that those claims are redundant of the municipal claims against the City.

"[O]fficial-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 n. 55 (1978).  "Where the governmental entity can itself be held liable for damages as a result of its official policy, a suit naming the legislators in their official capacity is redundant." *Schubert v. City of Rye*, 775 F. Supp. 689, 699 (S.D.N.Y. 2011) (quoting *Rini v. Zwirn*, 886 F. Supp. 270, 281 (E.D.N.Y. 1995)).  Accordingly, courts in the Second Circuit routinely dismiss official capacity claims against municipal officials as duplicative of the claims against the municipality. *See Phillips v. Cty. Of Orange*, 894 F. Supp. 2d 345, 384 n.35 (S.D.N.Y. 2012) (collecting cases).

The claims against de Mayor de Blasio, Commissioner Shea and Chief Monahan in their official capacities are, therefore, dismissed.

3.  Claims Against the Individual Defendants in Their Individual Capacities

All but the *Yates* plaintiffs sue Mayor de Blasio, Commissioner Shea and Chief Monahan in their individual capacities.  Defendants contend that the claims against them alleging constitutional violations should be dismissed because Plaintiffs have not adequately pled any theory, including supervisory liability, on which they could be held liable. They also bring a motion

for qualified immunity addressed to one set of claims: the *Sow* plaintiffs' claims arising out of the issuance and enforcement of the two curfew orders.

"Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. In other words, "a plaintiff must plead and prove the elements of the underlying constitutional violation directly against the official." *Tangreti v. Bachmann*, 983 F.3d 609, 620 (2d Cir. 2020). Prior to *Tangreti*, the Second Circuit held that the following could establish a defendant's personal involvement:

> 1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013). But in *Tangreti*, the Second Circuit rejected "a special test for supervisory liability." 983 F.3d at 620. Since *Tangreti*, whatever the alleged constitutional violation may be, "[t]he violation must be established against the supervisory official directly." *Id.* at 618.  A plaintiff must therefore allege facts that would, if proven, establish the government official's personal involvement in the violation of the plaintiff's rights.  *Celestin v. Angletta*, No. 19 CV 1887 (NSR), 2021 WL 1062344, at *4 (S.D.N.Y. Mar. 19, 2021).

I turn first to a discussion of all claims other than the *Sow* plaintiffs' claims relating to the issuance and enforcement of the curfew orders. I will discuss those claims separately (see *infra*., pp. 34 *et seq.*).

i.   *Claims Common to All Plaintiffs*

Plaintiffs have pleaded facts tending to show Chief Monahan's personal involvement in police activity at two of the protest events.  They allege that he was present at and personally led the NYPD's response to the June 4 protest in Mott Haven, where he personally directed officers to kettle, subdue and arrest protesters. (*People* A.C. ¶¶ 292-96, *Sierra* A.C. ¶ 46, *Wood* A.C. ¶¶ 124-26, *Sow* A.C. ¶ 87, 121, *Payne* A.C. ¶¶ 63, 65).  They also allege that Chief Monahan personally approved the mass use of pepper spray against protesters at the Barclays Center on May 29, 2020. (*People* A.C. ¶ 200.)  Those allegations raise an inference of his personal involvement in alleged violations of Plaintiffs' rights.  Defendants do not move to dismiss on grounds that those actions were unconstitutional. Nor does Chief Monahan move to dismiss claims arising out of these allegations on the ground of qualified immunity (a much more limited qualified immunity motion will be discussed in greater detail *infra*).

The Attorney General and the *Payne*, *Wood*, and *Sierra* plaintiffs have also stated a claim against Mayor de Blasio, insofar as they allege that he was personally involved  in the development of the tactics employed by the NYPD that they allege to be unconstitutional.  He allegedly admitted to having seen videos of the clashes between police and protesters and had personnel present at several of the protests.  (*Wood* A.C. ¶ 95.)  They further allege that he personally approved the strategies employed by the NYPD beginning during the June 3 and June 4 protests: During a June 7 press conference, de Blasio was asked, "Did you approve the tactics that we saw at [*sic*] the NYPD using, starting on June 3rd and June 4th?  That's the use of batons, more sort of pushing at protests, that kind of thing?  Did you approve those?"  He responded, "I approved the broad strategies and sometimes very specific choices."  (*People* A.C. ¶ 101, *Sierra* A.C. ¶ 45, *Wood* A.C. ¶ 93; *Payne* ¶ 73.)  This gets the plaintiffs past a motion to dismiss. Whether this claim against the Mayor survives a motion for summary judgment after discovery remains to be seen.

But no plaintiff has stated a claim for individual liability against Commissioner Shea. Their allegations amount to the following: Shea made several statements to the press indicating that he had seen protest footage and was aware of the confrontations between police and protesters, including at a June 4 news conference, during which he "spoke about the NYPD's purported adjustment of its tactics to the specific context of each protest, described in detail events at certain protests the previous night, and explained that the NYPD had recently made a tactical adjustment concerning vehicles" (*Wood* A.C. ¶ 84); he received regular reports from Chief Monahan and other NYPD officials responsible for implementing the City's response to the protests (*Payne* A.C. ¶ 91); he nonetheless failed to prevent NYPD officers from using the allegedly unconstitutional tactics, (*People* A.C. ¶¶ 102-03) and praised the NYPD's handling of the protests – for example, he described the NYPD's operation in Mott Haven as "a plan which was executed nearly flawlessly (*Payne* A.C. ¶ 69) – and at times made statements to the press criticizing the protesters and their calls to defund the police (*id.* ¶ 46).

Those allegations do not provide a sufficient basis from which this Court can infer that Commissioner Shea had any personal involvement in the alleged violations of Plaintiffs' constitutional rights. With regard to the allegations that he learned of the misconduct, "Receipt of notice after the violation is insufficient to constitute personal involvement in the violation." *Rahman v. Fisher*, 607 F. Supp. 2d 580, 585 (S.D.N.Y. 2009). His praise of the NYPD's response suggests only that he approved of their tactics after the fact – not that he had any role in designing those tactics in the first place. And while Plaintiffs allege in conclusory fashion that in some instances the Commissioner "personally directed, promoted and/or condoned the deployments and operations that led to this violence," (*Payne* A.C. ¶ 88), they plead no facts in support of that allegation.

Finally, to the extent Plaintiffs allege that the NYPD's mistreatment of protesters resulted from Commissioner Shea's failure to remedy the violations committed by individual officers: that is essentially a failure to intervene claim, and no plaintiff alleges that Commissioner Shea was present at any of the protests or that he was in a position to intervene. *Cf. Correa v. Lynch*, No. 20-CV-02875 (PMH), 2021 WL 2036697, at *6 (S.D.N.Y. May 20, 2021). Conclusory allegations of "deliberate indifference," without more, do not amount to personal involvement. *Brown v. Wetz*, No. 18CV11178(NSR), 2021 WL 964922, at *14 (S.D.N.Y. Mar. 15, 2021). To the extent plaintiffs ground their suggestion of personal involvement on some alleged failure by the Commissioner to discipline officers after the fact for misconduct that occurred during the protests, the argument obviously fails, as the Commissioner cannot be held liable for personal involvement in the allegedly unconstitutional actions that were perpetrated during the protests based on what he did or did not do after the protests were over.

ii.   *The Sow Curfew Order Claims and the Limited Qualified Immunity Motion*

The *Sow* plaintiffs (and only the *Sow* plaintiffs) allege that the imposition and the enforcement of the curfew orders was unconstitutional. More specifically, they allege that the curfew orders were unconstitutional on their face because they targeted protesters engaged in First Amendment expression, while exempting certain categories of workers deemed "essential." (*Sow* A.C. ¶ 76.) They also bring several as-applied challenges to the curfew orders: They allege that (1) the curfew orders were enforced against BLM protesters in retaliation for their anti-police views (*id.* ¶ 547); (2) the curfew orders were selectively enforced against the BLM protesters (*id.* ¶ 100); and (3) the curfew orders were vague and overbroad under the Due Process Clause of the Fourteenth Amendment (*id.* ¶ 556). They also allege that the curfew orders were unconstitutional as applied because protesters were not given clearly communicated dispersal orders or provided

with meaningful opportunity to disperse before they were arrested for violating the curfew. (*Id.* ¶¶ 96, 479.) They assert these claims against all three supervisory defendants.

Defendants move to dismiss all claims related to enforcement of the curfew orders on the ground of qualified immunity.

The doctrine of qualified immunity shields government employees from civil liability where performance of their discretionary functions "does not violate clearly established statutory or constitutional rights of which a reasonable person should have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Because qualified immunity is an immunity from suit rather than a mere defense to liability, the issue should be decided at the earliest opportunity – preferably at the outset of the case – and may be resolved on a Rule 12(b)(6) motion. *Liberian Cmty. Ass'n of Conn. V. Lamont*, 970 F.3d 174, 186 (2d Cir. 2020).

The best explanation I have ever read of the confounding doctrine of qualified immunity is found in the Second Circuit's opinion in *Stephenson v. Doe*, 332 F.3d 68 (2d Cir. 2003). There, the Circuit explained that when determining a motion to dismiss on qualified immunity grounds in advance of full merits discovery, the plaintiff's version of the facts is assumed to be true, "without regard to any objection defendants may have to the truth of plaintiff's version of events." *See Harris v. City of New York*, 222 F. Supp. 3d 341, 348 (S.D.N.Y. 2016) (internal citations omitted). The question to be answered is whether a reasonable government officer, confronted with the facts as alleged by plaintiff, could reasonably have believed that his actions did not violate some settled constitutional right.

There are two steps involved in determining qualified immunity. The court must determine whether, taking the facts in the light most favorable to the party asserting the injury, a constitutional infraction was committed. *Saucier*, 533 U.S. at 201. If the answer is no, the case is over – not

because the defendant is entitled to qualified immunity, but because the defendant did nothing wrong. *Harris*, 222 F. Supp. 3d at 348 (citing *Quezada v. Roy*, No. 14-cv-4056, 2015 WL 5970355, at *10 (S.D.N.Y. Oct. 13, 2015)). If, however, the answer is yes, the court must decide whether a reasonable official in the defendant's position (as that position is described by the plaintiff) ought to have known that he was violating the plaintiff's constitutional rights by doing what the plaintiffs alleges he did. At that point, the operative question becomes whether "the unlawfulness of [the official's] conduct was clearly established at the time." *Liberian Cmty.*, 970 F.3d at 186 (internal citations and quotations omitted)

Subsequent to *Stephenson*, the Supreme Court has clarified that a district court confronted with a qualified immunity motion may skip over the first question (was there or was there not a constitutional violation) and answer the question about whether a reasonable official in defendant's position (as that position is described by plaintiff) would have known that his conduct violated the law. *Pearson v. Callahan*, 555 U.S. 223 (2009). In most instances, that turns out to be the easiest way to dispose of a qualified immunity motion – especially when qualified immunity is asserted at the outset of a lawsuit, and "the answer to whether there was a violation may depend on a kaleidoscope of facts not yet fully developed." *Id.*

a.  First Amendment Challenge

The Sow plaintiffs first allege that the Mayor violated their First Amendment rights by ordering a curfew. It is so patently obvious that it was not unconstitutional for the Mayor to issue the curfew orders that it behooves the Court to dismiss this aspect of the *Sow* complaint because no violation of the plaintiffs' rights has taken place.

Disposal of a claim on these grounds is particularly appropriate where (as is so often the case) the moving defendants conflate the two questions in their motion. That is precisely what has happened here. Defendants argue that Mayor de Blasio is shielded from liability with respect to

36

the curfew order by the doctrine of qualified immunity because (1) plaintiffs have not pleaded any violation of a federal right, and (2) there was no clearly established law in June 2020 barring a mayor from imposing a curfew during a pandemic to protect the health and safety of residents. But if the answer to question (1) is that plaintiffs have not pleaded the violation of a federal right, then qualified immunity is irrelevant;  the Mayor (and his co-defendants) are entitled to dismissal, not on qualified immunity grounds, but because they have done nothing wrong. That is the case here.

Political demonstrations and protests lie at the heart of First Amendment concerns.  *See Boos v. Barry*, 485 U.S. 312, 318 (1988).  But First Amendment protections, while broad, are not absolute.  "Expression, whether oral or written or symbolized by conduct, is subject to reasonable time, place, or manner restrictions."  *Clark v. Cmty. for Creative Nonviolence*, 468 U.S. 288, 293 (1984).  The government may impose such restrictions in public forums so long as they "are justified without reference to the content of the regulated speech," "are narrowly tailored to serve a significant governmental interest, and "leave open ample alternative channels for communication of the information."  *Ibid.*

"The principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys."  *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (citing *Clark*, 468 U.S. at 295).  Not a single fact is pleaded in the *Sow* complaint tending to suggest that the curfew ordinances, EO 117 and EO 119, were adopted in order to suppress speech with which the defendants disagreed. In fact, the orders were entirely content neutral. The curfew was applicable to all citizens except those whose services were urgently required during the night hours – firemen, health care workers, police officers, peace officers, and "individuals travelling to and from essential work and performing essential work" –

and the homeless.  (Goykadosh Decl. Ex. F at 2.) The orders barred all large gatherings during the

night hours, regardless of the reason for them or any message that participants planned to convey.

They targeted no one and barred no message.

The curfew was narrowly tailored to a significant governmental interest. It is beyond

dispute that previous demonstrations, in New York and elsewhere – including BLM

demonstrations – had escalated during the night hours from peaceful protest "to include actions of

assault, vandalism, property damage, and/or looting." Such conduct, much of it criminal in nature,

posed a risk of "severe endangerment and harm to [residents'] health, safety, and property."

Because it is more difficult for the City to preserve public safety after dark, the curfew was limited

to the overnight hours.  (Goykadosh Decl. Ex. F.)[11]

That tailoring left protesters' First Amendment rights intact. Significantly, protesters were

not restricted from gathering to exercise their First Amendment rights during the day.  They were

barred from the streets only between the hours of 11:00 PM on June 1, 2020, until 5:00 AM on

June 2, 2020 (EO 117), and between the hours of 8:00 PM and 5:00 AM from June 2 until June 7.

(EO 119).[12]  The BLM protesters had over twelve hours every day during which to make their

point – the daylight hours, during which government officials could well have had reason to believe

fewer acts of vandalism and looting would take place, and during which period they could protect

---

[11] The orders also listed the pandemic as a reason for the curfew, but as it does not seem that the Mayor or Police Commissioner were prepared to break up crowds of demonstrators during the daylight hours, I set that to one side.

[12] The extension occurred on the night of June 1, after looters began ransacking storefronts and committing acts of violence before the 11:00 PM curfew had even started, and continued their spree throughout the night. *After Peaceful Protests, Looters Strike at Macy's and Across Midtown*, New York Times (June 2, 2020), https://www.nytimes.com/2020/06/02/nyregion/nyc-looting-protests.html.

more easily protect residents and business owners of the City from anything untoward that might happen.  No one was denied the right to protest by virtue of the Executive Orders.

Accordingly, this Court agrees with Defendants that the executive orders did nothing more than impose reasonable time, place and manner restrictions on Plaintiffs' right to protest, without curtailing those rights.  The curfew was not inconsistent with the protections of the First Amendment, and the Mayor (and his co-defendants, assuming they participated in the decision to impose a curfew) did nothing unconstitutional in issuing the executive orders. Therefore, the *Sow* plaintiffs' facial challenge to the curfew order is dismissed.

But should there be any doubt on that score, the individual defendants are clearly entitled to qualified immunity for issuing the curfew orders, for the simple reason that, in June 2020, there was no clearly established law prohibiting a mayor from imposing a content-neutral curfew, during a pandemic, to protect citizens from widespread looting, vandalism, and violence that were occurring in connection with similar protests elsewhere in the country.  To the extent that the *Sow* plaintiffs rely on recent Supreme Court jurisprudence in cases involving alleged incursions on the free exercise of religion during the pandemic, *see Roman Catholic Diocese v. Cuomo*, 141 S.Ct. 63 (2020),  that decision was not issued until after the BLM protests and the issuance of the early June 2020 curfew orders (it was handed down on November 25, 2020). So even assuming that the reasoning of that case could be extended to the situation facing the Mayor in early June of 2020 – a difficult and complicated issue that, as it has not been adequately briefed, need not be explored here[13] – the Supreme Court had not yet spoken in the arguably analogous context of free exercise

---

[13] That issue is whether *Diocese* is limited to free exercise rights or whether its reasoning extends to all First Amendment protected conduct (as the Sow plaintiffs argue). The parties have not begun to give this serious and complicated issue the briefing it deserves. Fortunately, the Court need not reach it because the fact that the Supreme Court did not settle the issue in the free

at the time the curfew orders were handed down. So no reasonable official in the Mayor's position in early June 2020 would have had any reason to think that  he could not order an emergency overnight curfew that contained carve outs for police, health care and other essential workers, because doing so would impermissibly impinge on the right of other individuals to engage in First Amendment protected activity. That being so, issuance of the order is a quintessential example of activity for which the issuing officials have qualified immunity.

> b.  Fourteenth Amendment Challenge: Vagueness

Next, the *Sow* plaintiffs allege that "Defendants enforced . . . the Curfew Orders . . . in a manner that rendered them constitutionally void for vagueness and/or overbroad, such that their enforcement against Plaintiffs violated their Due Process rights."  (*Sow* A.C. ¶ 556.)

As an initial matter, there is no such thing as an as-applied challenge for overbreadth under the Fourteenth Amendment.  Overbreadth challenges are a form of First Amendment challenge and an exception to the general rule against third-party standing.  *See Broadrick v. Okla.*, 413 U.S. 601 (1973).  A party alleging overbreadth contends that, although a statute did not violate his or her First Amendment rights, it would violate the First Amendment rights of a hypothetical third party if applied to that third party.  *Farrell v. Burke*, 449 F.3d 470, 498 (2d Cir. 2006) (citing *Broadrick*, 413 U.S. at 612).  "All overbreadth challenges are facial challenges, because an overbreadth challenge by its nature assumes that the measure is constitutional as applied to the party before the court."  *Id.*  For that reason, the Court dismisses the "as applied/overbreadth" aspect of the Sow plaintiffs' challenge to the curfew orders.

Turning to the as-applied/vagueness challenge to the curfew orders, dismissal is warranted because the orders are not at all vague, so no constitutional violation has occurred.

---

exercise context means that qualified immunity shields the Mayor and his co-defendants from liability on this novel and untested ground.

"It is established that a law fails to meet the requirements of the Due Process Clause if it is so vague and standardless that it leaves the public uncertain as to the conduct it prohibits." *City of Chicago v. Morales*, 527 U.S. 41, 56 (quoting *Giaccio v. Pennsylvania*, 382 U.S. 399, 402-03 (1966)).  There is a two-part test for as-applied vagueness challenges: a court must first determine whether the statute "gives the person of ordinary intelligence a reasonable opportunity to know what is prohibited and then consider whether the law provides explicit standards for those who apply it." *U.S. v. Nadi*, 996 F.2d 548, 550 (2d Cir. 1993) (cleaned up).

It hardly seems possible for a law to be more clear about what conduct it prohibits.  The curfew orders provide that, during specified times, "no persons or vehicles may be in public" aside from "police officers, peace officers, firefighters, first responders and emergency technicians, [the homeless], individuals travelling to and from essential work and performing essential work . . . and individuals seeking medical treatment or supplies."  The orders provide that any person who "knowingly violates the provisions in this Order shall be guilty of a Class B misdemeanor."  Surely a person of ordinary intelligence (1) knows what it means to be in public; (2) understands the meaning of the words 8:00 (or 11:00) PM to 5:00 AM; and (3) knows whether that individual is a police officer, peace officer, firefighter, first responder, emergency technician, homeless, or is travelling to/from essential work or seeking medical treatment or supplies.  If you are out after 8:00 (or 11:00) PM, and you are not peace officer, firefighter, first responder, emergency technician, homeless, travelling to/from essential work, or seeking medical treatment, you are in violation of the curfew order and guilty of a misdemeanor.

Neither is the term "essential worker" as used in the Executive Order vague or undefined. "Essential worker" was and is a term of art during the pandemic state of emergency. Essential work was identified in a series of Executive Orders issued by the Governor beginning in late March

of 2020.[14] So persons could readily identify whether they were or were not engaged in "essential work" at all times during the BLM protests.

Finally, nothing in the text of the curfew orders "encourages arbitrary and discriminatory enforcement." *See Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

As I read their complaint, the *Sow* plaintiffs do not appear to contest that there is anything unclear about the prohibition in EO 117 or EO 119; that is, they do not mount a facial challenge to the orders on vagueness grounds. Instead, they appear to allege that the law is vague as applied because there were instances in which officers failed to give mandatory dispersal orders before charging protesters with curfew violations.

The dispersal order issue is another red herring.

The aspect of the Executive Orders that required officers to give dispersal orders if they witnessed what appeared to be curfew violations governed the conduct of police officers, not the conduct of members of the public. If any officers who saw people out after curfew failed to give dispersal orders, they (the officers) failed to do their duty in the prescribed manner. That failure could impact the officers' ability to prove that certain plaintiffs who were arrested violated the curfew "knowingly," which in turn could affect the analysis of probable cause to arrest. *See Dinler*, 2012 WL 4513352, at *11.[15]

But the fact that a police officer may have failed to comply with the officer's obligations does not make it difficult for citizens to understand what conduct of theirs is prohibited by the

---

[14] *See* Executive Order 202.6; "Guidance for Determining Whether a Business Enterprise Is Subject To a Workforce Reduction Under Recent Executive Orders" (first issued Mar. 29, 2020; last updated Oct. 23, 2020), https://esd.ny.gov/guidance-executive-order-2026.

[15] This court does not here hold that an officer would have to issue a dispersal order before s/he would have at least "arguable probable cause" to arrest someone who is out after curfew without first giving a dispersal order. *See Zalaski v. City of Hartford*, 723 F.3d 382, 390 (2d Cir. 2013). That is an issue that will undoubtedly be litigated during this case.

curfew orders.  The conduct prohibited by the orders here challenged was being out in public between certain hours – not failing to obey a dispersal order.  *See Morales*, 527 U.S. at 49.  And unlike *Morales* – a case in which a Chicago ordinance used the paradigmatically vague term "loitering" to identify the forbidden conduct, and then defined loitering in a manner that had "no common and accepted meaning"[16] – the conduct that violates EO 117 and EO 119 is defined with sufficient precision to avoid any suggestion that it cannot be understood by a person of average intelligence.

       c.  Enforcement of the Curfew Orders

Finally, the *Sow* plaintiffs allege that the curfew orders were issued and/or enforced in a selective and/or retaliatory manner, thus rendering the individual defendants liable.  This contention, too, can be readily dismissed, except as to Chief Monahan.

The orders on their face do not apply "selectively."  They apply to anyone who is not homeless and who is not engaged in a line of work that can reasonably be deemed essential during the overnight hours (law enforcement, healthcare workers traveling to and from work, etc.).

The orders are not facially unreasonable.  The "carve out" for "essential workers" who needed to travel to and from work during the pandemic emergency was limited to workers whose services were required to provide basic and crucial services to New Yorkers, as clearly set forth in executive orders and guidance issued by the Governor's office (*see supra*, n.14).

The only allegation of fact made specifically against the Mayor is that he issued the curfew orders.  But I have already held that it was not unconstitutional for him to do so.  No facts are

---

[16] The ordinance defined "loitering" as "to remain in any one place with no apparent purpose." *Id.* at 56-57.  The curfew orders here under attack, by contrast, carve out exceptions for persons who were trying to keep the peace, treat the sick, obtain medical treatment, or engage in work that had been deemed "essential" under orders previously issued by the Governor of the State of New York. *See supra*, p. 41.

alleged tending to show that he decided to impose a curfew in order to retaliate against demonstrators; indeed, the order did not apply only to demonstrators, but to everyone who was not an essential worker. The *Sow* plaintiffs are simply throwing around loaded words, which are not back with allegations of specific fact.

There is no factual allegation in the *Sow* complaint that the Mayor, the Commissioner, or the Chief directed any member of the NYPD to enforce the curfew order selectively against some persons but not others, or in retaliation for protesters' anti-police views.  In fact, the *Sow* plaintiffs affirmatively allege that a message was sent to NYPD officers authorizing the issuance of a C summons for anyone – *anyone* – who violated the order.  That is the antithesis of selective or retaliatory enforcement.

If one of the plaintiffs in *Sow* can allege that the officer who issued him or her a summons for a curfew violations did so selectively, or in retaliation for protesting, then that plaintiff will have stated a claim against that particular officer. The individual officers have not moved to dismiss any of the claims asserted by the *Sow* plaintiffs, on qualified immunity grounds or otherwise (though they may later assert such a defense, as the facts are gathered).  But no such claim has been stated against any of the supervisory defendants.

As their last effort to challenge the enforcement of the curfew orders, the *Sow* plaintiffs claim that Defendants violated the Fourth Amendment by failing to issue dispersal orders before arresting protesters for curfew violations.

Not a single fact is alleged tending to show that the Mayor or the Commissioner personally failed to issue a dispersal order, or directed any police officer to ignore the plain text of the curfew orders by failing to issue a dispersal order. Nor is any fact alleged tending to show that the Mayor or the Commissioner was in any position to intervene when officers failed to issue dispersal orders.

There is, however, one aspect of the *Sow* plaintiffs' curfew order enforcement claim that can proceed. Chief Monahan is alleged to have been present at the Mott Haven protest that is the subject of the *Sow* complaint.  The plaintiffs allege that he directed the NYPD's planning and response to the Mott Haven protest. Specifically, the Sow plaintiffs allege that, at Chief Monahan's direction, NYPD officers surrounded and kettled the protesters shortly before 8:00 PM, which made it impossible for them to comply with the curfew order and resulted in their being falsely arrested. That claim cannot be dismissed at this juncture, either on the merits or on the ground of qualified immunity.

## CONCLUSION

Defendants' motion to dismiss the amended complaints is granted in part and denied in part, as follows:

1.  All claims against Defendants de Blasio, Shea and Monahan in their official capacities are dismissed.

2.  All claims against Defendant Shea in his individual capacity are dismissed.

3.  The *Sow* plaintiffs' claims relating to the issuance and enforcement of the curfew orders against Defendant de Blasio in his individual capacity are dismissed.

The Clerk of Court is directed to close the motion at docket numbers 105.

Dated: July 9, 2021

United States District Judge

BY ECF TO ALL COUNSEL