**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------ X

SAMIRA SIERRA, AMALI SIERRA, RICARDO
NIGAGLIONI, ALEX GUTIERREZ, and CHARLES
HENRY WOOD, on behalf of themselves and all others
similarly situated,

                            Plaintiffs,

        v.

CITY OF NEW YORK, a municipal entity; and
Mayor BILL DE BLASIO,
Chief of Department TERENCE A. MONAHAN,
Assistant Chief KENNETH C. LEHR,
Inspector ROBERT GALLITELLI,
Bureau Chief HARRY WEDIN,
Deputy Chief JOHN D'ADAMO,
Deputy Chief GERARD DOWLING,
Captain JULIO DELGADO,
Sergeant KENNETH RICE,
Sergeant THOMAS GARGUILO,
Police Officer JOHN MIGLIACCIO,
and Police Officer THOMAS MOSHER,
in their individual capacities,

                           Defendants.

------------------------------------------------------------------------ X

20-cv-10291 (CM)(GWG)
20-cv-10541 (CM)(GWG)

**CONSOLIDATED AND**
**AMENDED**
**CLASS ACTION**
**COMPLAINT**

JURY TRIAL DEMANDED

## PRELIMINARY STATEMENT

1.     More than half a century after law enforcement officers attacked civil rights marchers on the Edmund Pettus Bridge in Selma, Alabama, the New York City Police Department planned and executed a similar attack on a peaceful demonstration for racial equality in the Mott Haven neighborhood of the Bronx on June 4, 2020.  The Mott Haven protest was one of many that followed the execution of George Floyd at the hands of Minneapolis police.  The Bronx marchers were protesting vile acts of police violence against people of color and the role of police in perpetuating systemic racial inequality.

2.     NYPD officers directed the Mott Haven protesters into a trap, corralled (or "kettled") them, and attacked and arrested them *en masse*.  Videos from the June 4th Mott Haven protest show heavily-armored phalanxes of police using batons, bicycles, and pepper spray to assault a racially diverse group of people who were peacefully protesting for racial justice.

3.     This was an intentional and unconstitutional effort to suppress the protesters' message, to intimidate them, and to send a message to racial justice protesters throughout New York City.  The NYPD Police Commissioner at the time later said, "We had a plan which was executed nearly flawlessly in the Bronx," echoing the Mayor's public statement that "what happened in Mott Haven . . . is something that the NYPD saw coming."  The Mayor also described his personal oversight of the NYPD's operations, saying publicly that he "approved the broad strategies and sometimes very specific choices" related to the NYPD's actions at the Mott Haven protest and other demonstrations.

4.     Nor is there any doubt that the NYPD's attack on the Mott Haven protesters was motivated by animus toward their message.  The Police Commissioner at the time put it bluntly when he stated that the demonstrators' anti-police message "disgusts me to my core."

5.      After the murder of George Floyd, people across the United States marched to demand that Black Lives Matter and to denounce police violence against people of color and the role of police in maintaining systemic racial inequality.  The protests called for defunding and even abolishing the police.  The protests demanded full and equal protection of the law – the same cause that brought people into the streets of Selma in 1965 and, fifty years later, into the streets of Ferguson, Missouri, and starting in late May 2020, to cities and towns across the United States and across the world.  In places like Minneapolis, Louisville, and New York City, including the South Bronx, those protesters were met with the very police brutality that they were protesting.

6.      The many protests in New York City were universally critical of the NYPD and its continued policies of targeting and victimizing people of color – echoing protests after the NYPD's unjustified killings of Ramarley Graham, Akai Gurley, Eric Garner, Delrawn Small, Sean Bell, and many others.  The protests called for reforming or dismantling the NYPD and re-directing funds to needed social and civic programs in communities of color.

7.      City officials, including Mayor BILL DE BLASIO, Police Commissioner Dermot F. Shea, and Chief of Department TERENCE A. MONAHAN, openly expressed hostility toward the protesters' views.[1]  The NYPD suppressed the protests by kettling and violently attacking and arresting demonstrators.[2]

8.      The NYPD carried out one such operation against demonstrators who had gathered in the South Bronx on June 4, 2020.  People of the South Bronx had reason to protest racially discriminatory police practices.  The South Bronx was where Amadou Diallo was gunned down

---

[1] The titles held by City officials at the time of the events recounted are used throughout this Complaint.

[2] Allison McCann, Blacki Migliozzi, Andy Newman, Larry Buchanan and Aaron Byrd, *N.Y.P.D. Says It Used Restraint During Protests. Here's What the Videos Show*, N.Y. TIMES (June 14, 2020), *available at* https://www.nytimes.com/interactive/2020/07/14/nyregion/nypd-george-floyd-protests.html.  The videos of NYPD officers using unprovoked and unjustified force during the George Floyd/Black Lives Matter demonstrations contained in this article are incorporated herein.

by NYPD officers, as were many others.  The South Bronx is the U.S. Congressional district with the highest percentage of people of color of any district in the United States, and the NYPD's now infamous stop-and-frisk program was pervasive in the Bronx.  The purpose of stop-and-frisk was, in the words of former Police Commissioner Ray Kelly, "to instill fear" in young Black and Latino men "that every time they left their homes they could be stopped by police."[3]  Although stop-and-frisk was declared unconstitutional in 2013, it had been the policy for over a decade and was not easily dismantled.  To this day court-ordered remedial efforts are attempting to root out the NYPD's institutionalized practice of racially biased policing.[4]

9.      Human Rights Watch published a video report about the NYPD's June 4th operation in Mott Haven, which is publicly available online at https://www.hrw.org/news/2020/09/30/us-new-york-police-planned-assault-bronx-protesters.  The video report includes witness interviews and video recorded at the protest.  It shows a peaceful, racially diverse march of protesters, exercising their First Amendment rights well before the Mayor's 8:00 p.m. curfew.  It also shows NYPD officers trapping protestors before the curfew went into effect.  The officers refused to allow protesters to disperse and engaged in unprovoked violence before and during the arrests of the protesters.  The officers were overseen personally by Chief of Department TERENCE A. MONAHAN; KENNETH C. LEHR, Commanding Officer of NYPD Patrol Borough Bronx; ROBERT GALLITELLI, Commanding Officer of the 40th Precinct; HARRY WEDIN, Bureau Chief of the Special Operations Bureau; JOHN D'ADAMO, Commanding Officer of the NYPD

---

[3] Donald F. Tibbs and Tryon P. Woods, *Requiem for Laquan McDonald: Policing as Punishment and Abolishing Reasonable Suspicion*, 89 TEMPLE L. REV. 763, 769 (2017).

[4] Periodic updates about these efforts are posted on the "Official Website of the NYPD Monitor," http://NYPDmonitor.org.

Strategic Response Group; and GERARD DOWLING, Executive Officer of the Strategic Response Group.

10.     This lawsuit seeks justice for the civil rights violations against the Mott Haven protesters.  Plaintiffs seek compensatory and punitive damages for their injuries and the injuries of the other people illegally seized and assaulted by the police during the NYPD's Mott Haven operation.

## JURISDICTION

11.     This Court has jurisdiction over plaintiffs' civil rights claims brought under 42 U.S.C. § 1983 pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3), (4).

12.     Plaintiffs invoke supplemental jurisdiction over any and all state law claims and as against all parties that are so related to claims in this action within the original jurisdiction of this court that they form part of the same case or controversy, pursuant to 28 U.S.C. § 1367.

## VENUE

13.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events alleged herein were committed within this district.

## JURY DEMAND

14.     Plaintiffs demand a jury trial on each and every claim to which they are legally entitled to a jury.

## COMPLIANCE WITH NEW YORK GENERAL MUNICIPAL LAW

15.     Plaintiffs filed Notices of Claim with the Comptroller of the City of New York within 90 days of the events complained of herein.

16.     Plaintiffs have complied with all other applicable requirements of the New York General Municipal Law, including attending General Municipal Law § 50-h examinations.

17.     More than thirty days have elapsed since the filing of the Notice of Claim, and adjustment or payment thereof has been neglected or refused.

## PARTIES

18.     Plaintiffs SAMIRA SIERRA, AMALI SIERRA, RICARDO NIGAGLIONI, ALEX GUTIERREZ, and CHARLES HENRY WOOD are citizens and residents of the State of New York and of the United States.  At all relevant times, they were residents of the City of New York.  They are referred to collectively herein as "the named plaintiffs."

19.     Defendant CITY OF NEW YORK ("the City") is a municipal entity created and authorized under the laws of the State of New York.

20.     The City is authorized by law to maintain a police department and does maintain the New York City Police Department (referred to herein as "the NYPD").  The NYPD acts as the City's agent and the City assumes the risks incidental to the maintenance of a police department and the employment of police officers.

21.     Defendant BILL DE BLASIO was, at all times relevant to this Complaint, the Mayor of the City of New York and the chief executive officer of the City of New York.

22.     Section 8 of the City Charter provides that the Mayor "shall exercise all the powers vested in the city" and "shall be responsible for the effectiveness and integrity of city government operations and shall establish and maintain such policies and procedures as are necessary and appropriate to accomplish this responsibility."

23.     Defendant Chief of Department TERENCE A. MONAHAN was, at all times relevant to this Complaint, the NYPD Chief of Department.

24.     The Chief of Department is the highest-ranking uniformed officer in the NYPD. All members of the NYPD are required to follow lawful orders issued by the Chief of Department.

25.     The Chief of Department oversees and supervises all NYPD operations and is responsible for developing and implementing NYPD policing policies.

26.     Defendant Assistant Chief KENNETH C. LEHR was, at all times relevant to this Complaint, Commanding Officer of NYPD Patrol Borough Bronx.

27.     The Commanding Officer of Patrol Borough Bronx oversees and supervises patrol operations in the Bronx.  All members of the NYPD under his command are required to follow lawful orders issued by the Commanding Officer.

28.     Defendant Inspector ROBERT GALLITELLI was, at all times relevant to this Complaint, the Commanding Officer of the 40th Precinct in the Bronx.

29.     Defendant Bureau Chief HARRY WEDIN was, at all times relevant to this Complaint, the Commanding Officer of the NYPD Special Operations Bureau.

30.     The Commanding Officer of the Special Operations Bureau oversees and supervises the Strategic Response Group, the Emergency Services Unit, the Aviation Unit, the Harbor Unit, and the Mounted Unit.  All uniformed members of the NYPD under his command are required to follow orders issued by the Commanding Officer.

31.     Defendant Deputy Chief JOHN D'ADAMO was, at all times relevant to this Complaint, the Commanding Officer of the NYPD Strategic Response Group, or "SRG."

32.     The Commanding Officer of SRG oversees and supervises SRG and its subdivisions. All uniformed members of the NYPD under his command are required to follow lawful orders issued by the Commanding Officer.

33.     Defendant Deputy Chief GERARD DOWLING was, at all times relevant to this Complaint, the Executive Officer of SRG.

34.     Defendant Captain JULIO DELGADO was, at all times relevant to this Complaint, the Commanding Officer of the NYPD Strategic Response Group 2 ("SRG-2"), a unit within SRG.

35.     Defendant Sergeant KENNETH RICE, an attorney, was, at all times relevant to this Complaint, assigned to the NYPD Legal Bureau.

36.     Defendant Sergeant THOMAS GARGUILO was, at all times relevant to this Complaint, assigned to SRG.

37.     Defendant Police Officer JOHN MIGLIACCIO was, at all times relevant to this Complaint, assigned to the NYPD Police Service Area 7.

38.     Defendant Police Officer THOMAS MOSHER was, at all times relevant to this Complaint, assigned to SRG.

39.     The individual defendants are all sued in their individual capacities.

40.     At all times relevant herein, the individual defendants were employed by the City and acted under color of law in the course and scope of their duties and authority as officers, agents, servants, and employees of the NYPD and the City.

41.     At all relevant times, the individual defendants violated clearly established rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution of which reasonable officials in their respective circumstances would have known.

42.     At all times relevant to this Complaint, individual defendants MONAHAN, LEHR, GALLITELLI, WEDIN, D'ADAMO, and DOWLING, were NYPD Chiefs and Inspectors of the City of New York who had authority to establish policy for the City and the NYPD.

43.     The City of New York is liable under 42 U.S.C. § 1983 pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978), *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986), and other decisions.

## STATEMENT OF FACTS

### I.      The June 4th Mott Haven Protest Rally

44.     On June 4, 2020, at approximately 6:30 p.m., people gathered at The Hub in the South Bronx to participate in the first large demonstration in that borough since police killed George Floyd.

45.     The Hub is one of the "most dynamic commercial centers" in the Bronx and has been called "the Times Square of the Bronx."[5]   The description is apt for the geographic configuration of The Hub, which is formed by the intersection of East 149th Street and Willis, Melrose, and Third Avenues.

46.     The purpose of the June 4th rally was to demand racial justice and accountability for police violence against people of color.   The protesters chanted "I can't breathe"—the last words of George Floyd and of Eric Garner, who was killed by an NYPD officer—and other messages critical of the NYPD.   The protesters left The Hub and marched through the Mott Haven neighborhood.

### II.     The NYPD's Operation to "Kettle" and Attack the June 4th Mott Haven Marchers

47.     In an effort to suppress the Mott Haven protesters' message and to intimidate them—to send a message of their own to protesters across New York City and those who were supportive of the protesters' message—the NYPD planned in advance and orchestrated an operation to encircle and seize, or "kettle," the racially diverse protesters, assault them, and arrest them in the heart of a community of color.

---

[5] Alison Gregor, *People, Shops and Roads Converge Here*, N.Y. TIMES (June 8, 2012), *available at* https://www.nytimes.com/2012/06/10/realestate/the-hub-the-bronx-living-in-people-shops-and-roads-converge-here.html.

48.     Defendant DE BLASIO stated publicly that he "approved the broad strategies and sometimes very specific choices" related to the NYPD's tactics carried out in Mott Haven on June 4 and earlier.

49.     Defendants MONAHAN, LEHR, GALLITELLI, WEDIN, D'ADAMO, and DOWLING gathered at the 40th Precinct in the Bronx on the afternoon of June 4, 2020. Throughout that afternoon, different combinations of these defendants – all NYPD Chiefs and Inspectors – met with each other and together arrived at an overall plan to arrest the participants in the protest.  These defendants coordinated the plan with at least five other NYPD Chiefs and numerous Inspectors and Captains who were personally present at the 40th Precinct and throughout the police operation resulting in the arrest of plaintiffs.

50.     Different combinations of these defendants –  MONAHAN, LEHR, GALLITELLI, WEDIN, D'ADAMO, and DOWLING – met with and gave instructions to subordinate officers who supervised police units that were part of the overall plan to arrest the participants in the protest. They directed and supervised over 700 police officers in units that were assigned tasks in advance for different phases of the operation, including: physically stopping and encircling the protesters, taking the seized individuals into custody and placing them in flex-cuffs, taking custody of arrestees who had been cuffed and preparing their paperwork at Mass Arrest Processing Centers and Precinct stationhouses, and transporting the arrestees in arrest vans and Corrections Department buses.  Each of these defendants supervised other officers and directed them to seize, assault, and arrest plaintiffs and other people.  Some of them personally physically seized, assaulted, and arrested protesters and other people on East 136th Street between Brook Avenue and Brown Place.

51.     Defendant NYPD Captain DELGADO supervised foot officers of a Strategic Response Group that seized the plaintiffs pursuant to the overall plan for the NYPD's operation in Mott Haven, and personally physically seized, assaulted, and arrested people who were encircled on East 136th Street between Brook Avenue and Brown Place on June 4, 2020.  After the arrests, DELGADO gave a false account of the incident to the Office of the Bronx District Attorney.

52.     Defendant attorney RICE told defendants LEHR, D'ADAMO, DOWLING and other defendants that there was probable cause to arrest plaintiffs, and was directly involved in seizing, assaulting, and arresting plaintiffs and other people who were seized on East 136th Street between Brook Avenue and Brown Place on June 4, 2020.

53.     Defendants GARGUILO and MOSHER were directly involved in seizing, assaulting, and arresting plaintiff WOOD and others on East 136th Street between Brook Avenue and Brown Place on June 4, 2020.

54.     Defendant MIGLIACCIO pepper-sprayed plaintiff NIGAGLIONI and other people on East 136th Street between Brook Avenue and Brown Place on June 4, 2020.

55.     Defendants intended to instill fear in the Mott Haven protesters and others who might join them in further non-violent protests for racial justice and police reform, and to deter them from doing so.

**III.     The March and Arrests**

56.     After the rally at The Hub, the protesters began peacefully marching down Third Avenue.  NYPD officers followed and tracked the course of the march on all sides.

57.     The march continued through the grounds of the Patterson Houses, a public housing development whose residents are primarily people of color.  Residents voiced their support for the protesters' message, and some leaned out their windows banging pots and pans.

58.     The march continued peacefully south on Willis Avenue, still tracked by police on all sides.  At various times, protesters chanted slogans expressing their anger over the conduct of the NYPD in their community.

59.     At East 135th Street and Willis Avenue, defendant LEHR and other defendants formed a line of officers and bicycles, and the protesters, who were moving south on Willis Avenue, turned east onto East 136th Street toward Brook Avenue.

60.     The march was orderly and peaceful.  There were no instances of violence, no confrontations with police or anyone else, and no harm to property.

61.     As the group of protesters proceeded east on East 136th Street, NYPD officers on bicycles, under the direction defendants WEDIN, D'ADAMO, DOWLING and other defendants used themselves and their bicycles to block the Brook Avenue end of the block of East 136th Street between Brook Avenue and Brown Place.  They were joined and supervised by defendants MONAHAN, GALLITELLI, and DELGADO.

62.     It was NYPD Chiefs, not the supervisors within a bike squad, who made the decision as to where the line of bikes would be formed.

63.     Meanwhile, defendants LEHR, WEDIN, D'ADAMO, DOWLING and RICE, and a phalanx of SRG officers under their supervision, moved in behind the protesters from the Brown Place end of the East 136th Street block, completely encircling and trapping the people on the block in a police maneuver known as "kettling" or "encirclement."

64.     From that point on, the seized people on East 136th Street were not permitted to leave.

65.     Defendants encircled and seized the protestors on East 136th Street before 8:00 p.m.; the curfew was not yet in effect.

12

66.     At no time from the moment that protesters first gathered at The Hub until they were kettled and seized on East 136th Street did any NYPD officer order the protesters to disperse or instruct them to leave the roadway where they marched.

67.     As the protesters were held in the kettle, they asked NYPD officers to allow them to leave, and chanted "Let us go! Let us go!"

68.     Defendants did not permit protesters to leave the kettle.

69.     With the protesters trapped and detained, the NYPD launched the next phase of its plan.  Without warning, the individual defendants and scores of officers under their command assaulted the people seized on East 136th Street.

70.     Defendants  MONAHAN,  LEHR,  GALLITELLI,  WEDIN,  D'ADAMO, DOWLING,  DELGADO,  RICE,  GARGUILO,  MIGLIACCIO,  and  MOSHER  oversaw, supervised, and directed other officers and personally participated in the assault upon and the cuffing of the people seized on East 136th Street.

71.     Officers with batons and shields struck people at the edge of the encircled group, and officers thrust raised bicycles into the trapped group, forcing the encircled people tightly together.  Defendant MIGLIACCIO and other officers sprayed them with pepper spray.

72.     The protesters had committed no acts of violence or resistance that would justify this excessive and unreasonable use of force.

73.     Many people were left injured and bleeding.  Some fainted or lost consciousness and went into convulsions.

74.     Defendant MONAHAN personally ordered the arrest of one of the organizers and leaders of the protest who was committing no offense and was engaged in protected speech at the very moment he ordered officers to arrest her.

75.     Volunteer medics and legal observers were arrested.

76.     Individuals who happened to be on East 136th Street between Brook Avenue and Brown Place at the time of the police operation – individuals who had not marched from The Hub and were not protesting – were arrested.  Other people who were in the vicinity after the curfew, but were not protesting, were not arrested.

77.     Many people who had done nothing to the officers and were not resisting arrest were violently thrown to the ground before they were handcuffed, or otherwise violently forced to bring their arms behind them.  Officers systematically applied zip-tie "flex-cuffs" that were cinched tighter than necessary.  Approximately 300 people were detained in flex-cuffs.

78.     Many protesters complained that their zip-tie cuffs were too tight and were causing their hands to become numb, and many protesters' hands turned purple.

79.     None of the people arrested on June 4th on East 136th Street received a summons at the scene.

80.     Instead, the NYPD held protesters in overly tight zip-tie cuffs and transported them to mass arrest processing facilities and precinct stationhouses.

81.     Throughout the NYPD's June 4th operation, most of the officers did not wear face masks or face shields to prevent the transmission of the coronavirus.

82.     On June 4, 2020, New York City had suffered more than 280,000 reported cases of COVID-19, and over 1,000 new cases were reported that day.

83.     Unlike the police, most of the protesters *did* wear masks or face shields, but in many instances, officers forcibly removed protesters' masks and face shields, further endangering their safety.

84.     Once arrested, people were unable to re-position their masks to cover their noses and mouths while they were rear-cuffed, and as a result, they were transported to the arrest processing facilities in enclosed vehicles without proper face coverings.  Protesters complained that their faces were left uncovered, but nothing was done to assist them.

85.     The protesters spent from 6 to 20 hours in custody; some were held longer and detained until the next afternoon.

86.     During that time, individual defendants went to the NYPD arrest-processing facility in Queens where many of the arrestees were being processed.

87.     Arrestees detained at the Queens facility asked individual defendants to wear face masks, but they refused to do so.

88.     At the Queens facility, individual defendants instructed officers to stop issuing summonses and instead to issue all remaining arrestees Desk Appearance Tickets, thus prolonging their detention.

89.     Defendant DELGADO gave a false account of the incident to the Bronx District Attorney's Office in support of charges against the people arrested on East 136th Street.

90.     Defendant DELGADO created a uniform scripted narrative to be used by officers processing protesters' arrests. The scripted narrative falsely stated, among other things, that protesters were "slapping and shoving the police," that the "crowd was ordered to disperse and refused," that "some members of the crowd [were in] possession of . . . hammers[] and wrenches," and that an NYPD Inspector was "stabbed in the left arm" during the protest.

91.     In September 2020, the Bronx District Attorney's Office filed a motion to dismiss 312 summonses issued to people arrested at the Mott Haven protest on June 4, 2020, and declined to prosecute 61 Desk Appearance Tickets.

## IV.   Experiences of the Named Plaintiffs

### A.   Samira Sierra

92.   Plaintiff Samira Sierra is a Black Dominican woman who is a lifelong resident of the Bronx.  On June 4, 2020, she was 28 years old.  She graduated from the State University of New York at Albany in 2013 and entered the Peace Corps in 2014; she served in Madagascar for two years.  At the time of her arrest in Mott Haven she was working in business development in the technology sector.

93.   On the afternoon of June 4, 2020, plaintiff Samira Sierra and her sister, plaintiff Amali Sierra, attended the protest at The Hub.  Because of the ongoing COVID pandemic, she and her sister were wearing face masks.

94.   At some point, plaintiff Samira Sierra saw protesters leave The Hub and begin to march down the roadway of Third Avenue.  She and her sister followed them and participated in the roadway march, protesting with the group.  When she arrived on East 136th Street, she and her sister were enclosed in the NYPD kettle.

95.   Plaintiff Samira Sierra asked police officers that she be permitted to leave the encircled group but was told she could not.

96.   Plaintiff Samira Sierra saw the police using pepper spray on protesters.  She was concerned that the pepper spray could have a bad effect on people's respiratory systems during the COVID-19 epidemic.

97.   After cuffing people closer to the edge of the group, officers got to plaintiff Samira Sierra and her sister.  As plaintiff Amali Sierra was putting a bottle of water in her backpack, she was seized by a group of officers who threw her to the ground.  Both plaintiff Samira Sierra and her sister told the officers that plaintiff Amali Sierra had multiple sclerosis and was disabled.  A

police officer said to plaintiff Samira Sierra, in sum and substance, "why would your sister be out here protesting if she's disabled?"

98.     Five or six officers seized plaintiff Samira Sierra and threw her to the ground, causing an injury on her left arm that, as of the date of filing of this Complaint, is still a visible scar.  She was put in zip-tie cuffs that were excessively tight.  She and her sister sat on the pavement, with their hands zip-tie cuffed behind their backs, for a number of hours.

99.     Police Officer Umid Karimov took plaintiff Samira Sierra from her place on the ground to a bus, and when she complained to him that the zip-tie cuffs were too tight, he did nothing to relieve her pain.  She stood in a line of similarly-escorted protesters waiting to be placed on the bus.

100.     Police Officer Alfredo Jeff approached plaintiff Samira Sierra and told her that he was assigned to be her arresting officer.  She and her sister were taken on the bus to an arrest processing location in Queens.

101.     Plaintiff Samira Sierra was placed in a holding cell with her sister and many other women.  Although many of the women in the holding cell requested food and water, none was provided.  There was no toilet paper, and although many women asked for toilet paper, and some women asked for sanitary supplies, none were provided.

102.     Police Officer Alfredo Jeff issued a pink summons to plaintiff Samira Sierra charging her with Violation of Mayor's Executive Order, and she was released from detention during the morning of June 5, 2020.

103.     All charges were dismissed against plaintiff Samira Sierra.

B.      **Amali Sierra**

104.    Plaintiff Amali Sierra is an Afro-Dominican woman who is a lifelong resident of the Bronx.  On June 4, 2020, she was 22 years old.  She graduated from the State University of New York at Albany in 2019; and has pursued a career in fine arts museum curation.  She has multiple sclerosis.

105.    On June 4, 2020, plaintiff Amali Sierra attended the protest at The Hub with her sister, plaintiff Samira Sierra.  She and her sister left The Hub with the other protesters, and she was kettled with the group of protesters on East 136th Street.

106.    Plaintiff Amali Sierra could smell and feel the pepper spray the police were spraying on the kettled protesters, and was concerned that the pepper spray could have a bad effect on people's respiratory systems during the COVID-19 epidemic.

107.    After cuffing people closer to the edge of the group, officers got to plaintiff Amali Sierra and her sister.  As she was putting a bottle of water in her backpack, she was seized by a group of officers and slammed to the ground.  She was brought to her feet and zip-tie cuffed.  The cuffing and violent take-down left bruises on her wrists and arms that were visible for approximately two weeks.

108.    As the officers cuffed plaintiff Amali Sierra, both she and her sister told the officers that she had multiple sclerosis and was disabled.  A white-shirted officer stated, "don't come to a riot when you have MS, how about that!"  Plaintiff Amali Sierra and her sister were seated on the pavement, with their hands zip-tie cuffed behind their backs, for a number of hours.  She was escorted by a police officer to a bus, where she stood in a line of similarly-escorted protesters waiting to be placed on the bus.  Police Officer Alfredo Jeff approached her, and said that he was

assigned to be her arresting officer.  She and her sister were taken on the bus to an arrest processing location in Queens.

109.    Police Officer Alfredo Jeff issued a pink summons to plaintiff Amali Sierra charging her with Violation of Mayor's Executive Order, and she was released from detention during the morning of June 5, 2020.

110.    All charges were dismissed against plaintiff Amali Sierra.

**C.    Ricardo Nigaglioni**

111.    Plaintiff Ricardo Nigaglioni is a Black-Latino man who has been a lifelong resident of the Bronx.  On June 4, 2020, he was 30 years old.  He is an R&B and hip-hop singer-songwriter, and is also employed as a teaching artist by various non-profit organizations.

112.    On June 4, 2020, plaintiff Nigaglioni went to the protest at The Hub with plaintiff Gutierrez.  He left The Hub with the other protesters, and was kettled with the group on East 136th Street.  He was wearing a face shield and face mask to protect himself and others from the coronavirus.

113.    Plaintiff Nigaglioni wanted to leave before the 8:00 p.m. curfew, and asked police officers to permit him to do so, but they refused.  Defendant MIGLIACCIO lifted Plaintiff Nigaglioni's face shield, pulled down his face mask, and pepper sprayed him in the face, blinding him.  Plaintiff Gutierrez attempted to assist and guide him.  When an officer agreed to their request to leave, they attempted to do so, but plaintiff Nigaglioni was immediately tackled and placed in zip-tie cuffs, and then taken to the middle of the street, where he was put on his knees on the pavement.

114.    Plaintiff Nigaglioni experienced pain and irritation in his eyes for approximately six weeks to two months, and vision problems to the date of the filing of this Amended Complaint.

He experienced pain in his wrists from tight zip-tie cuffs, which marked his skin and causes intermittent weakness and discomfort in his wrists when he plays instruments, uses a computer, and participates in other similar activities.

115.    Plaintiff Nigaglioni was also concerned that the pepper spray could have a bad effect on his and others' respiratory systems during the COVID-19 pandemic.

116.    Plaintiff Nigaglioni remained on the ground for a number of hours and was then escorted to a bus which took him to an arrest processing facility in Queens.  He was placed in a holding cell with many other men.  Although many of the men in the holding cell requested food and water, none was provided.  There was no toilet paper, and although the prisoners requested toilet paper, it was not provided.  His face mask and shield were no longer on his person when he was placed in the holding cell.

117.    At no time during his detention was he provided with any assistance or treatment for the injuries he sustained from pepper spray and tight handcuffs.

118.    Police Officer Debora Matias issued a pink summons to plaintiff Nigaglioni charging him with violation of the curfew, and he was released from detention the morning of June 5, 2020.

119.    All charges were dismissed against plaintiff Nigaglioni.

**D.    Alex Gutierrez**

120.    Plaintiff Alex Gutierrez is an Afro-Latino man who has been a lifelong resident of the Bronx.  On June 4, 2020, he was 29 years old.  He has been an employee of the New York City Department of Education for over ten years, teaching Physical Education to special needs children and coaching baseball, basketball and football.  He is also employed as a coach and teaching artist by various non-profit organizations.

121.    On June 4, 2020, plaintiff Gutierrez went to the protest at The Hub with plaintiff Nigaglioni.  He left The Hub with the other protesters, and was kettled with the group of protesters on East 136th Street.  He was wearing a face shield and face mask to protect himself and others from the coronavirus.

122.    Plaintiff Gutierrez wanted to leave before the 8:00 p.m. curfew, and asked police officers to permit him to do so, but they refused.  He saw plaintiff Nigaglioni get pepper sprayed after his face shield had been lifted and his face mask pulled down.

123.     Plaintiff Gutierrez pleaded with officers to permit him to escort plaintiff Nigaglioni—who was complaining that he could not see—out of the kettle.  As plaintiff Gutierrez was guiding plaintiff Nigaglioni by grasping Nigaglioni's arm with his hand, a police officer struck plaintiff Gutierrez with a baton on his arm.  Pepper spray from more than one police source got into his eyes.  He was concerned that the pepper spray could have a bad effect on his and others' respiratory systems during the COVID-19 epidemic.

124.    Plaintiff Gutierrez was forced to the ground, and then taken to the middle of the street.  He saw a young woman lose consciousness.  He experienced pain in his wrists from tight zip-tie cuffs which cut into his skin, and continues to experience pain.

125.    Plaintiff Gutierrez remained on the ground for a number of hours, and was then escorted to a bus which took him to an arrest processing facility in Queens.  When plaintiff Gutierrez arrived, he was required to stand in a line outdoors in the rain for hours before being taken into the facility.  He was placed in a holding cell with many other men.  There was no toilet paper, and although the prisoners requested toilet paper, it was not provided.

126.    On June 5, 2020, at approximately 4:00 p.m., Police Officer Andre Jeanpierre issued a Desk Appearance Ticket to plaintiff Gutierrez, and he was released.

127.    The Bronx District Attorney declined to prosecute the charges against plaintiff Gutierrez.

**E.    Charles Henry Wood**

128.    On June 4, 2020, Mr. Wood attended the protest in Mott Haven with several friends. Mr. Wood believed it was important to exercise his right to peaceful protest to support and amplify the concerns of Bronx residents who were marching in their own community.  Mr. Wood believes that systemic racism and violence of our police institutions urgently needs to change, and on the day in question he decided to speak up for change.

129.    When the protest reached East 136th Street, lines of police hemmed in the group of protesters on all sides, preventing them from moving.

130.    At some point, without any warning, police rushed into the area where Mr. Wood was standing.

131.    The police started hitting people with batons, discharging chemical spray, and pulling people out of the crowd and arresting them.

132.    As the police did so, people started falling down.

133.    Mr. Wood was standing next to a young Black woman who fell down, screaming that she had hurt her leg and could not put any weight on it.

134.    Mr. Wood huddled over the young woman in an effort to prevent others from falling on her.

135.    As Mr. Wood hunched over in an effort to protect the woman, an NYPD officer struck Mr. Wood hard in the upper back with a police baton.

136.    Defendant MOSHER then ripped Mr. Wood away from behind, dragged him away from the crowd, lifted him, and threw him to the ground.

137.   Mr. Wood's elbow struck the ground hard as he was thrown down.

138.   Police put their knees on Mr. Wood's back.

139.   Defendant GARGUILO handcuffed Mr. Wood very tightly with plastic zip-tie cuffs.

140.   Mr. Wood did not have any weapon in his possession.

141.   Mr. Wood did not actively or passively resist arrest.

142.   Mr. Wood did not engage in any violence toward any NYPD personnel at any time.

143.   Mr. Wood did not use any physical force against any NYPD personnel at any time.

144.   Mr. Wood did not witness any other person engage in any act of violence toward any NYPD personnel on June 4, 2020.

145.   Large groups of arrestees were placed on buses while handcuffed for several hours.

146.   Multiple buses, including Mr. Wood's, went to Queens Central Booking in Kew Gardens for processing of the arrests.

147.   After being taken off the buses, the arrestees were lined up outside several hours before being processed.

148.   Mr. Wood repeatedly complained to police that his zip-tie cuffs were too tight and were very painful, as did most of the other arrested protesters on the line.

149.   There were dozens of officers present, but only one captain appeared to have access to cutters that could cut through the plastic zip-tie cuffs.

150.   Mr. Wood's zip-tie cuffs were not removed until about three or four hours after he complained about the pain he was experiencing because they were too tight.

151.   The zip-tie cuffs were so tight that, when they were finally removed, the person removing them had to dig the blade of the cutter into the skin of Mr. Wood's wrist to get the off.

152.    Mr. Wood was held with about 10-12 other people in a cramped cell overnight without food or water.

153.    While he was in custody, Mr. Wood's right hand swelled dramatically like a baseball due to the tightness of the zip-tie cuffs.

154.    In the late morning of June 5, 2020, Mr. Wood was given a Desk Appearance Ticket for unlawful assembly under Penal Law § 240.10, signed by police officer Ismael Hernandez Carpio.

155.    Mr. Wood was then released from custody.

156.    The purported basis for Mr. Wood's arrest was relayed entirely by Defendant DELGADO to the arresting officer.

157.    Defendant DELGADO did not observe Mr. Wood engage in any lawful activity or have any particularized information that Mr. Wood engaged in any unlawful activity.

158.    In the weeks and months after the police assault in Mott Haven, Mr. Wood kept replaying the experience over and over in his mind.

159.    He was traumatized by what happened to him and what he saw happen to others.

160.    Mr. Wood's hand remained swollen for more than a week after the protest.

161.    He continued to experience an unusual loss of sensation in his thumb that he had never experienced before being zip tied on June 4 and had a lasting mark on his hand where the scissors dug into his skin to remove the zip-tie cuffs.

162.    The District Attorney declined to prosecute Mr. Wood.

**V.    City Officials' Expressions of Hostility Toward the Protesters' Message and Support for Unjustified Police Violence Against the Protesters.**

163.    In the days leading up to the NYPD's June 4th Mott Haven operation, individual defendants and other high-level officials in the NYPD, made public statements that were hostile

toward the message of the protesters – to defund or abolish the police, and end racially-biased law enforcement practices – and supported the violent response by police officers to the protests.

164.   On June 2, 2020, defendant MONAHAN publicly made disparaging comments about the message of many protesters to defund or abolish the police.

165.   Before he was promoted to Chief of Department, defendant MONAHAN served as a Deputy Chief.  In that position, he orchestrated an NYPD operation to kettle a large group of peaceful protesters during the 2004 protests of the Republican National Convention in New York City, and then ordered their arrests.  Then-District Judge Richard Sullivan, now a Circuit Court Judge of the Second Circuit Court of Appeals, concluded that defendant MONAHAN's actions were unconstitutional.[6]  After trial, a jury found defendant MONAHAN liable for $25,000 in punitive damages for his intentional and malicious conduct.[7]  Defendant MONAHAN was later promoted to Chief of Department, the highest-ranking uniformed officer in the NYPD.

166.   On May 30, 2020, in response to a video of an NYPD SUV driving into a crowd of peaceful protesters, defendant Mayor DE BLASIO said publicly, "I do believe the NYPD has acted appropriately."

167.   At a press conference on June 4, 2020, the same day as the NYPD's operation in Mott Haven, Police Commissioner Shea laid bare his opinion of the message carried by protesters like those in Mott Haven: "You look at the anti-police rhetoric, it disgusts me to my core."

---

[6] *See Dinler v. City of New York*, No. 04 Civ. 7921 (RJS) (JCF), 2012 U.S. Dist. LEXIS 141851, at *27-39 (S.D.N.Y. Sept. 30, 2012).

[7] *Abdell v. City of New York*, No. 05 Civ. 8453 (RJS), Judgment at Dkt. 432. The City of New York paid those punitive damages on MONAHAN's behalf, thus ratifying his conduct.

168.     Defendant Mayor DE BLASIO also spoke at a press conference on June 4, 2020, and claimed, incredibly, that he had not seen any of the many widely-circulated videos of police violence against protesters in Brooklyn on June 3rd.

169.     Defendant Mayor DE BLASIO praised the NYPD's response to the protests and did not disavow the NYPD's use of violence against protesters.

170.     During a June 5, 2020, press conference the day after the NYPD's operation in Mott Haven, Police Commissioner Shea praised the operation: "We had a plan which was executed nearly flawlessly in the Bronx."

171.     Defendant Mayor DE BLASIO said at the June 5th press conference that "observers for City Hall" were at the NYPD's Mott Haven operation, and they reported to the Mayor what they observed.

172.     Defendant DE BLASIO and Shea have made disparaging public statements about the June 4th Mott Haven protest, claiming that it was intended "to cause mayhem," and have attempted to justify the NYPD's actions with false claims that "people appeared at the protest with weapons and gasoline."

173.     City Officials and other high-level officials in the NYPD have made other public statements critical of the message of police reform and racial equality in policing.

**VI.     The City's Official Investigation of the NYPD's Policing of the George Floyd/Black Lives Matter Demonstrations, Including the June 4th Mott Haven Protest, and Other Lawsuits Concerning the NYPD's Policing of Demonstrations.**

174.     The New York City Department of Investigation ("DOI") conducted an investigation of the NYPD's response to the George Floyd/Black Lives Matter Demonstrations.

175.    On December 18, 2020, the DOI released a report, "Investigation into NYPD Response to the George Floyd Protests," about its findings.[8]

176.    The DOI found that, among other things:

a.      the "NYPD's use of force on protesters—encirclement (commonly called 'kettling'), mass arrests, baton and pepper spray use, and other tactics—reflected a failure to calibrate an appropriate balance between valid public safety or officer safety interests and the rights of protesters to assemble and express their views";

b.      some of the NYPD's "policing decisions relied on intelligence without sufficient consideration of context or proportionality," specifically during the June 4th Mott Haven protests; and

c.       "most officers responding to the protests had not received recent relevant training for policing protests."  DOI Report pp. 3-4, 39-62.

177.    The DOI also found, with regard to the NYPD's June 4th operation in Mott Haven:

Unlike some protests that continued in various parts of Manhattan and Brooklyn well after 8:00 p.m., the NYPD strictly enforced the curfew in the Bronx, after protesters marched from The Hub (the area around the intersection of East 147th Street, Willis Avenue, and 3rd Avenue) through the neighborhood of Mott Haven. Shortly before the 8:00 p.m. curfew took effect, NYPD Strategic Response Group (SRG) bicycle squad officers blocked the path of the protest group at Brook Avenue and East 136th Street. Simultaneously, another group of NYPD personnel approached from behind the protest group to enclose a larger portion of the group on a block with parked cars lining either side.

DOI Report p. 21.

178.    The NYPD's June 4th operation in Mott Haven reflected the NYPD's operation generally in response to the George Floyd/Black Lives Matter demonstrations.

179.    On June 3, 2020, the NYPD had carried out a similar operation in Brooklyn: NYPD officers surrounded non-violent protesters who were critical of the NYPD and its history of racially

---

[8] The DOI report is available at https://www1.nyc.gov/assets/doi/reports/pdf/2020/DOIRpt.NYPD Reponse. GeorgeFloyd Protests.12.18.2020.pdf.

biased policing; and as they later did in Mott Haven, NYPD officers violently assaulted and arrested protesters in retaliation for their exercise of free speech.

180.    The circumstances of the NYPD's June 3rd operation in Brooklyn are described in detail in another federal lawsuit filed on July 15, 2020, *Gelbard* et al. *v. City of New York* et al., 20 Civ. 3163 (MKB) (RER) (E.D.N.Y.).

181.    The NYPD's June 3rd operation in Brooklyn and the June 4th operation in Mott Haven were similarly violent toward the protesters.

182.    As described in the *Gelbard* Complaint, the NYPD carried out no less than six other operations between May 29th and June 4th that involved the same tactics deployed during the Mott Haven operation on June 4th, that is, surrounding protesters critical of the NYPD and police practices that target communities of color, and violently assaulting and arresting protesters. *Gelbard* Complaint ¶¶ 51-75.

183.    Another federal lawsuit, *Payne v. de Blasio*, 20 Civ. 8924 (CM)(GWG), filed by the New York Civil Liberties Union and The Legal Aid Society, describes these same NYPD operations and others with the same general tactics as those deployed on June 4th in Mott Haven:

> Protesters repeatedly were met with the very pattern of police violence they marched to end. The Mayor of New York and the NYPD's leadership condoned and even promoted that violence. . . . These attacks . . . were undertaken in retaliation for the protesters' message — calling for greater police accountability, a reallocation of funding from away from police departments and into Black and Latinx communities, the end of police brutality, and a recognition that Black Lives Matter.

*Payne* Complaint ¶¶ 1, 3, 35-60.

184.    The *Payne* Complaint also describes the "widespread and frequent" violence committed by NYPD officers against "protesters at demonstrations and rallies in support of Black Lives Matter and against police violence." *Payne* Complaint ¶ 63.

185.    In July 2020, the Attorney General of the State of New York released a "Preliminary Report on the New York City Police Department's Response to Demonstrations Following the Death of George Floyd."  It described widespread violence by NYPD officers directed at peaceful protesters.

186.    On January 14, 2021, the New York Attorney General filed *People of the State of New York v. City of New York*, 21 Civ. 322 (CM)(GWG), which describes a troubled history, beginning in the early 2000's, of NYPD policing of protest activity.  This includes application of "disorder control" methods without due regard for the First Amendment rights of protesters.  It also presents graphic evidence of the widespread use of police violence against the George Floyd/Black Lives Matter protesters – violence far in excess of what took place at the largescale protests of earlier years.

187.    On January 21, 2021, *Sow v. City of New York*, 21 Civ. 533 (CM) (GWG), was filed.  It also describes decades of unconstitutional policing of protest activity by the NYPD, and especially egregious conduct in the policing of the George Floyd/Black Lives Matter protests.[9]

## VII.    The NYPD's History of Racially Biased Policing and Deliberate Indifference to Racial Bias in the Police Department.

188.    In 2013, the Court in *Floyd v. City of New York,* 08 Civ. 1034 (S.D.N.Y. 2013), and related actions, following an exhaustive trial found that the NYPD engaged in widespread intentional racial discrimination through its "Stop and Frisk" policy and practices.

189.    Also in 2013, the Office of the Inspector General of the New York City Police Department ("OIG-NYPD") was created by Local Law 70, which amended the City Charter.

---

[9] All allegations in the operative complaints in the above-referenced *Gelbard*, *Payne*, *People*, and *Sow* actions are incorporated by reference into these pleadings.

190.    OIG-NYPD issued a report on June 26, 2019 entitled, "Complaints of Biased Policing in New York City: An Assessment of NYPD's Investigations, Policies, and Training" ("OIG Biased Policing Report").[10]   The report was based on an examination of the "NYPD's handling of 888 biased policing allegations filed between late 2014 and early 2017 and closed by mid-2017."  OIG Biased Policing Report at 2.

191.    The OIG Biased Policing Report noted that prior to October 2014 the "NYPD did not track biased policing complaints."  OIG Biased Policing Report at 1.  Biased policing is prohibited by New York City Administrative Code Section 14-151, which was enacted long before 2014, and has since been amended to address continuing evidence of racially biased practices by the NYPD.

192.    OIG-NYPD found that of the 2,495 complaints of biased policing that the NYPD investigated between November 2014 and the end of 2018, the NYPD substantiated none.  OIG Biased Policing Report at 17-18.

193.    OIG-NYPD recommended, among other things, that (1) the "NYPD should amend its Patrol Guide policies to explicitly require NYPD officers and non-uniformed employees to report instances of biased policing upon observing or becoming aware of such conduct"; (2) the "NYPD should amend its Patrol Guide policies so that complaints alleging the use of offensive or derogatory language associated with an individual's actual or perceived protected status, such as racial slurs, are classified as biased policing if there is a discriminatory intent"; and (3) the "NYPD should amend its *written* investigative procedures related to biased policing so that offensive or derogatory language associated with an individual's actual or perceived protected status, such as

---

[10] The OIG Biased Policing Report is available at https://www1.nyc.gov/assets/doi/reports/pdf/2019/Jun/19BiasRpt_62619.pdf.

an officer's use of racial slurs, is classified, investigated, and adjudicated as a biased policing matter." OIG Biased Policing Report at 52-53.

194.   The NYPD rejected each of these three OIG-NYPD recommendations concerning biased policing. *See* Sixth Annual OIG-NYPD Report, at 9-10, issued April 9, 2020.[11]

195.   In August 2019, the President of the NYPD Sergeants Benevolent Association ("SBA"), the second largest NYPD union, emailed a racist video clip to thousands of NYPD Sergeants. The union president, Edward Mullins, accompanied the clip with his own opinion: "Pay close attention to every word. You will hear what goes through the mind of real policemen every single day on the job. This is the best video I've ever seen telling the public the absolute truth."[12]

196.   The video includes a narrator saying, "The projects will always be dens of crime and violence . . . Cops will continue to wade into that fray and blacks will continue to attack and ambush us forever."

197.   The SBA President was also the subject of a December 16, 2020 City Council proceeding on "Racism, Bias, and Hate Speech in the NYPD."[13] City Council members questioned NYPD First Deputy Commissioner Benjamin Tucker and NYPD Assistant Deputy Commissioner for Legal Matters Oleg Chernyavsky about the fact that Sgt. Mullins had appeared publicly with a QAnon mug. 12/16/2020 City Council Hearing Tr. 52-65.

---

[11] The Sixth Annual OIG-NYPD Report is available at https://www1.nyc.gov/assets/doi/reports/pdf/2020/OIGNYPD_SixthAnnualReportFinal_4.9.2020.pdf.

[12] Jake Offenhartz, *NYPD Police Union Boss: Sorry For Sharing Racist Video, 'I Have Black Friends'*, Gothamist (Aug. 14, 2019), https://gothamist.com/news/nypd-police-union-boss-sorry-for-sharing-racist-video-i-have-black-friends.

[13] The City Council Committee on Oversight Briefing Report on Racism, Bias, and Hate Speech in the NYPD, and the transcript of the December 16, 2020 City Council hearing are available at **Error! Hyperlink reference not valid.**.

198.     Finally, in February 2021, the Civilian Complaint Review Board substantiated three complaints against Sgt. Mullins, two for offensive language and one for abuse of authority, the latter for having publicly disclosed the arrest of the Mayor's daughter, who was detained during the George Floyd/Black Lives Matter protests.[14]

199.     The NYPD has not disciplined Sgt. Mullins for any of these acts.

200.     During the George Floyd/Black Lives Matter summer demonstrations, a video was widely circulated – and viewed millions of times – of an NYPD officer displaying a "white power" symbol at one of the protests.

201.     There was no question what the officer's symbol meant.  NBC News said it was "not publishing or linking to the video to avoid providing a platform to apparent expressions of hate or white supremacy."[15]

202.     While the NYPD said it would investigate the incident, no city official publicly condemned the officer's conduct.

203.     As described in the *Payne* Complaint at ¶ 34:

When the COVID-19 pandemic hit New York City, the NYPD's enforcement practices disproportionately targeted Black and Latinx New Yorkers.  In early May, the Kings County District Attorney's Office found that 35 out of 40 people arrested for social distancing violations were Black New Yorkers.  Additionally, while officers handed out protective equipment in largely white neighborhoods, they used aggressive tactics to enforce social distancing in majority Black and Latinx neighborhoods.[16]  In a bystander video gone viral, Officer Francisco Garcia is captured on video tackling, punching, and sitting on top of a Black man during an

---

[14] Christopher Robbins, *Police Union Boss Calls Misconduct Charges "Laughable"*, Gothamist (Feb. 15, 2021), https://gothamist.com/news/police-union-boss-calls-misconduct-charges-laughable.

[15] Janelle Griffith and Matteo Moschella, *NYPD officer appears to make white power sign at protest, prompting probe*, NBC News (June 4, 2020), https://www.nbcnews.com/news/us-news/nypd-officer-appears-make-white-power-sign-protest-prompting-probe-n1224141.

[16] Ashley Southall, *Scrutiny of Social-Distance Policing as 35 of 40 Arrested Are Black*, N.Y. Times (May 7, 2020), https://www.nytimes.com/2020/05/07/nyregion/nypd-social-distancing-race-coronavirus.html; Josiah Bates, *Police Data Reveals Stark Racial Discrepancies in Social Distancing Enforcement Across New York City*, TIME (May 8, 2020), https://time.com/5834414/nypd-social-distancing-arrest-data/.

arrest of social distancing enforcement.[17]   A young Black mother was brutally arrested inside a subway station, in front of her young child, for improperly wearing a mask.[18]  At the same time, photos, videos, and complaints of officers refusing to wear masks proliferated, reinforcing a sense of deep frustration at racist and unfair police encounters.[19]

204.   On December 16, 2020, the New York City Council Committee on Oversight and Investigations, and the Committee on Public Safety, issued a Briefing Paper and conducted a hearing on Racism, Bias, and Hate Speech in the NYPD.[20]  The hearing devoted significant attention to the Commanding Officer of the NYPD's Equal Employment Office, Deputy Inspector James Kobel, who had also served as the Executive Officer of the NYPD's Equal Employment Office for approximately five years prior to becoming Commanding Officer.

205.   An investigation by the City Council revealed that Kobel posted explicitly racist, misogynist, homophobic, and anti-Semitic messages on an online site frequented by police officers, one of many such sites where police officers express similar views.[21]  The City Council Committee, not the NYPD, had investigated and identified Kobel as the person who had expressed these vile views.

206.   The NYPD had known about the site where Kobel posted, "Law Enforcement Rant," for "at least a decade," and as NYPD First Deputy Commissioner Tucker explained, "people

---

[17] *Video of NYPD Arrest During Social Distancing Enforcement Sparks Outcry*, ABC NEWS (May 4, 2020), https://abc7ny.com/nypd-violent-arrest-east-village-caught-on-camera-legal-aid/6147631/; Justine Re, *Viral Videos Spark Concern About Unequal Social Distancing Enforcement in Five Boroughs*, SPECTRUM NEWS (May 6, 2020), https://www.ny1.com/nyc/all-boroughs/coronavirus-blog/2020/05/06/controversial-social-distancing-arrest.

[18] Jake Offenhartz, *Violent Arrest Of Brooklyn Mom During Mask Confrontation Deemed "Troubling" By De Blasio,* GOTHAMIST (May 14, 2020), https://gothamist.com/news/violent-arrest-brooklyn-mom-during-mask-confrontation-deemedtroubling-de-blasio.

[19] Michael Wilson, *Why Are So Many NYPD Officers Refusing to Wear Masks at Protests?*, N.Y. TIMES (June 11, 2020), https://www.nytimes.com/2020/06/11/nyregion/nypd-face-masks-nyc-protests.html.

[20] https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=4729634&GUID=BB06F546-F91F-44E6-927A-A8AB902A74A5&Options=&Search=.

[21] https://council.nyc.gov/press/2020/11/06/2039/.

who are on it are police officers." When First Deputy Commissioner Tucker was asked if he was "aware that members of your department are engaging in hate speech and explicit bias on these online message boards?" he responded, "we don't monitor that site regularly." He also testified that the NYPD had not attempted to monitor and investigate these message boards and unmask the identities of officers on these message boards.

## CLASS ACTION ALLEGATIONS

207.    Plaintiffs seek to represent a certified class pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure consisting of all persons who were arrested in the kettle on East 136th Street between Brown Place and Brook Avenue at the June 4th Mott Haven demonstration.

208.    The members of the class are so numerous as to render joinder impracticable.

209.    Upon information and belief, more than three hundred people were seized and arrested in the kettle at the June 4th Mott Haven demonstration, and they are all members of the proposed class.

210.    Upon information and belief, many class members who had their rights violated by the City's unconstitutional policies and practices have not pursued individual claims due to the difficulty of pursuing litigation and fear of retaliation by law enforcement.

211.    The class members' claims share a number of common questions of law and fact, including, but not limited to:

a.    Whether the June 4th Mott Haven protesters were arrested in retaliation for their protected First Amendment speech;

b.    Whether it was the City's policy, practice, or custom to arrest the June 4th Mott Haven protesters in retaliation for their protected First Amendment speech;

c.    Whether the June 4th Mott Haven protesters had permission to march in the roadway and on sidewalks, and were seized without an order to disperse or an opportunity to disperse;

d.    Whether the June 4th Mott Haven protesters were ordered to disperse before they were seized;

e.    Whether the June 4th Mott Haven protesters were arrested without probable cause in violation of the Fourth Amendment;

f.    Whether the purported basis for probable cause for the arrest of the June 4th Mott Haven protesters furnished to prosecutors was fabricated;

g.    Whether it was the City's policy, practice, or custom to arrest the June 4th Mott Haven protesters without probable cause in violation of the Fourth Amendment;

h.    Whether the June 4th Mott Haven protesters were subjected to excessive force in violation of the Fourth Amendment;

i.    Whether it was the City's policy, practice, or custom to use excessive force against the June 4th Mott Haven protesters in violation of the Fourth Amendment;

j.    Whether the June 4th Mott Haven protesters were targeted for arrest, excessive force, or other law enforcement action on account of their advocacy for racial equality in violation of the Fourteenth Amendment; and

k.    Whether it was the City's policy, practice, or custom to target the June 4th Mott Haven protesters for arrest, excessive force, or other law enforcement action on account of their advocacy for racial equality in violation of the Fourteenth Amendment.

212.    The named plaintiffs' claims are typical of those of the class.  Like the other members of the class, the named plaintiffs were protesters who were assaulted, seized and arrested at the June 4th Mott Haven demonstration.

213.    Plaintiffs have a strong personal interest in the outcome of this action, have no conflicts of interest with members of the plaintiff class, and will fairly and adequately protect the interests of the class.

214.    Plaintiffs are represented by Michael L. Spiegel, Joshua S. Moskovitz, Lance A. Clarke, Robert Rickner, Douglas Lieb, and Alison Frick.  Plaintiffs' counsel are experienced attorneys who have more than 75 years of combined litigation experience.

215.    Mr. Moskovitz and Mr. Spiegel have litigated hundreds of § 1983 actions in federal court.  Mr. Moskovitz has appeared as class counsel in other class action lawsuits, including a lawsuit concerning the City's response to protests during the 2004 Republican National Convention.  Mr. Moskovitz is currently lead counsel in a putative class action pending in this Court against the State of New York addressing religious discrimination claims brought by a putative class of New York State Correction Officers.  Mr. Spiegel represented hundreds of protesters in the same Consolidated RNC Litigation.  He is also counsel in a pending putative class action in the EDNY concerning the NYPD's treatment of disabled arrestees.

216.    Mr. Clarke is a partner with and co-founder of the law firm Hamilton Clarke LLP. He is a veteran litigator with extensive trial experience.

217.    Mr. Rickner has represented over one hundred plaintiffs with § 1983 claims. Mr. Rickner has represented putative classes in two other civil rights cases, as well as over a dozen wrongful conviction cases that have resulted in multi-million dollar settlements. Prior to becoming a civil rights lawyer, Mr. Rickner worked at two large firms, focusing on litigating complex commercial cases, and mass torts. For over five years, Mr. Rickner managed the Port Authority of New York and New Jersey's defense of the World Trade Center Disaster Site mass tort litigation, ultimately settling over ten thousand cases.

218.    Mr. Lieb and Ms. Frick are partners at Kaufman Lieb Lebowitz & Frick LLP, which has an extensive background in civil rights and complex civil litigation, including certified class actions concerning the unlawful confinement of New York State prisoners without judicial imposition of sentence and wage-and-hour violations, and putative class actions concerning excessive force against detainees in City jails, over-detention of detainees in City jails, and

disability discrimination against State prisoners in providing access to alternative incarceration programs.

219.    Plaintiffs' counsel have the resources, expertise, and experience to prosecute this action, and know of no conflicts among members of the class or between the attorneys and members of the class.

220.    A damages class should be certified pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure because questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## FIRST CAUSE OF ACTION
### 42 U.S.C. § 1983 (First Amendment) Against All Defendants

221.    Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

222.    In committing the acts and omissions complained of herein, the defendants acted under color of state law, individually and in concert, including by failing to adequately train, supervise, and discipline the defendants, to deprive plaintiffs of the rights protected by the First Amendment to the United States Constitution by directing the plaintiffs to be targeted for law enforcement action in retaliation for their free speech.

223.    As a result of the foregoing, plaintiffs were deprived of liberty, suffered specific and serious bodily injury, emotional distress, costs, and expenses, and were otherwise damaged and injured.

224.    The unlawful conduct of the individual defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

**SECOND CAUSE OF ACTION**
**42 U.S.C. § 1983 (Fourth Amendment) Against All Defendants**

225.    Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

226.    In committing the acts and omissions complained of herein, the defendants acted under color of state law, individually and in concert, including by failing to adequately train, supervise, and discipline the defendants, to deprive plaintiffs of the rights protected by the Fourth Amendment to the United States Constitution.

227.    As a result of the foregoing, plaintiffs were deprived of liberty, suffered specific and serious bodily injury, emotional distress, costs, and expenses, and were otherwise damaged and injured.

228.    The unlawful conduct of the individual defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

**THIRD CAUSE OF ACTION**
**42 U.S.C. § 1983 (Fourteenth Amendment) Against All Defendants**

229.    Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

230.    In committing the acts and omissions complained of herein, the defendants acted under color of state law, individually and in concert, including by failing to adequately train, supervise, and discipline the defendants, and deprived plaintiffs of the rights protected by the Fourteenth Amendment to the United States Constitution.

231.    As a result of the foregoing, plaintiffs were deprived of liberty, suffered specific and serious bodily injury, emotional distress, costs, and expenses, and were otherwise damaged and injured.

232.    The unlawful conduct of the individual defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## FOURTH CAUSE OF ACTION
### State Law False Arrest and False Imprisonment Against Defendant City of New York

233.    Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

234.    By the actions described above, NYPD officials, while acting in the course and scope of their duties as officials, agents, and/or employees of the City of New York, falsely arrested and imprisoned plaintiffs, or caused plaintiffs to be falsely arrested and imprisoned, without probable cause, illegally and without a warrant, and without any right or authority to do so.

235.    The acts and conduct of NYPD officials were the direct and proximate cause of injury and damage to plaintiffs and violated plaintiffs' statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

236.    As a result of the foregoing, plaintiffs were deprived of liberty, suffered specific and serious bodily injury, emotional distress, costs, and expenses, and were otherwise damaged and injured.

## FIFTH CAUSE OF ACTION
### State Law Assault and Battery Against Defendant City of New York

237.    Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

238.     By the actions described above, NYPD officials, while acting in the course and scope of their duties as officials, agents, and/or employees of the City of New York, did inflict assault and battery upon plaintiffs.

239.     The acts and conduct of NYPD officials were the direct and proximate cause of injury and damage to plaintiffs and violated statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

240.     As a result of the foregoing, plaintiffs were deprived of liberty, suffered specific and serious bodily injury, emotional distress, costs, and expenses, and were otherwise damaged and injured.

### SIXTH CAUSE OF ACTION
**State Law Denial of Medical Attention Against Defendant City of New York**

241.     Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

242.     NYPD officials, while acting in the course and scope of their duties as officials, agents, and/or employees of the City of New York denied and/or delayed providing plaintiffs reasonable, good faith medical attention while plaintiffs were in custody of defendants.

243.     As a result, plaintiffs suffered serious injury or significant exacerbation of injury.

244.     The NYPD officials' conduct violated New York Civil Rights Law Section 28.

245.     As a result of the foregoing, plaintiffs were deprived of liberty, suffered specific and serious bodily injury, emotional distress, costs, and expenses, and were otherwise damaged and injured.

## SEVENTH CAUSE OF ACTION
### State Law Intentional or Negligent Infliction of Emotional Distress Against Defendant City of New York

246.    Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

247.    By the actions described above, NYPD officials, while acting in the course and scope of their duties as officials, agents, and/or employees of the City of New York, engaged in extreme and outrageous conduct, which intentionally and/or negligently caused severe emotional distress to plaintiffs.

248.    The acts and conduct of NYPD officials were the direct and proximate cause of injury and damage to plaintiffs and violated their statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

249.    As a result of the foregoing, plaintiffs were deprived of liberty, suffered specific and serious bodily injury, emotional distress, costs, and expenses, and were otherwise damaged and injured.

## EIGHTH CAUSE OF ACTION
### State Law Negligent Hiring, Screening, Retention, Training, Supervision, and Discipline Against Defendant City of New York

250.    Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

251.    The City, acting through the NYPD, has a duty to use reasonable care in the hiring, screening, retention, training, supervision, and discipline of their employees, including police officers.  The City and the NYPD failed to discharge this duty.

252.    The City and the NYPD knew of multiple complaints and substantiated findings of misconduct and constitutional violations by the individual defendants prior to the violations of the plaintiffs' rights.

41

253.    The City and NYPD failed to investigate and correct the problems with individual defendants' behavior.

254.     The violations of plaintiffs' rights by NYPD officials was a foreseeable consequence of the City's and NYPD's failure to adequately screen, train, reprimand, or discipline, the individual defendants.

255.    As a direct and proximate result of NYPD officials' conduct, plaintiffs suffered the injuries and damages set forth above.

**NINTH CAUSE OF ACTION**
**State Law Excessive Detention Against Defendant City of New York**

256.    Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

257.    NYPD officials, while acting in the course and scope of their duties as officials, agents, and/or employees of the City of New York, intentionally detained plaintiffs, transported them to arrest processing facilities where their detention continued, and did not issue appearance tickets.

258.    As a direct and proximate result of NYPD officials' conduct, plaintiffs suffered the injuries and damages set forth above.

**WHEREFORE**, Plaintiffs, on behalf of themselves and other members of the class they seek to represent, respectfully request that this Court:

a.    enter an order certifying this consolidated action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, for the class described herein with the named plaintiffs as class representatives;

b.    award plaintiffs, and the members of the class they seek to represent, compensatory damages in an amount that is fair and reasonable, to be determined at trial;

a.      award plaintiffs, and the members of the class they seek to represent, punitive damages against the individual defendants in an amount to be determined at trial;

b.      award plaintiffs, and the members of the class they seek to represent, reasonable attorneys' fees and costs, and interest; and

c.      grant such other and further relief as this Court deems appropriate and equitable.

Dated: September 16 2022

_____
Joshua S. Moskovitz, Esq.
THE LAW OFFICE OF JOSHUA MOSKOVITZ, P.C.
392 Central Avenue # 7803
Jersey City, New Jersey 07307
(212) 380-7040
josh@moskovitzlaw.com

_____
Michael L. Spiegel, Esq.
48 Wall Street, Suite 1100
New York, New York 10005
(212) 587-8558
mikespieg@aol.com

_____
        /s/
Lance A. Clarke, Esq.
HAMILTON CLARKE, LLP
48 Wall Street, Suite 1100
New York, NY 10005
(646) 603-0522
lc@hamiltonclarkellp.com

_____
Douglas E. Lieb, Esq.
Alison Frick, Esq.
KAUFMAN LIEB LEBOWITZ & FRICK LLP
18 E. 48th Street, Suite 802
New York, New York 10017
(212) 660-2332
dlieb@kllflaw.com
africk@kllflaw.com

_____
        /s/
Rob Rickner, Esq.
RICKNER PLLC
14 Wall Street, Suite 1603
New York, New York 10005
(212) 300-6506
rob@ricknerpllc.com